IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| DEKALB GENETICS CORPORATION, | Civil Action No. 04 C 50323 |
| Plaintiff, | · 5 - 3 5 5 |
| v. | JURY TRIAL DEMANDED |
| SYNGENTA SEEDS, INC. AND SYNGENTA BIOTECHNOLOGY, INC., | Judge Philip G. Reinhard |
| | Magistrate Judge P. Michael Mahoney |
| Defendants. | |

## DEKALB'S OPPOSITION TO
## SYNGENTA'S CONTINGENT MOTION TO TRANSFER

### I.    INTRODUCTION

DEKALB Genetics Corp. ("DEKALB") opposes Syngenta Seeds, Inc. and Syngenta Biotechnology, Inc.'s ("Syngenta") Contingent Motion To Transfer.

This Court first acquired jurisdiction over the '880 patent in 1996 when DEKALB sued several defendants (including Syngenta's predecessor companies Northrup King Co. and Ciba-Geigy Corp.) for infringement of the '880 patent and other patents relating to corn transformation. Those cases were not all settled and dismissed until 2001, after an extensive claim construction hearing, summary judgment motions, pretrial proceedings, and one trial. Consequently, this Court has years of experience dealing with the parties, the '880 patent, and this complex technology.

No factors exist that favor transferring this case to Delaware. As Syngenta admitted in its brief, Delaware is not a more convenient forum for the parties or



witnesses. Thus, DEKALB's choice of its home forum should be entitled to substantial weight.

Additionally, it will be a waste of judicial resources to litigate this case anywhere else, including in Delaware. Since the Delaware court has no experience with the '880 patent and the related '863 patent, it will have to duplicate this Court's efforts in learning the facts and technology behind these patents. Consolidating this case with the Delaware case will only delay resolution of this case. As a result of the previous litigation between the parties involving the '880 patent, a claim construction order already exists and extensive discovery has occurred. In contrast, there has been no discovery or substantive rulings in the Delaware case involving the Shah patents at issue there.

Syngenta also incorrectly argues that there will be a risk of inconsistent decisions, but there is no such risk because this case and the Delaware case involve unrelated patents with different validity and infringement issues. In the interest of justice, this case should be adjudicated in this district.

## II.    BACKGROUND

### A.    The Illinois Case And The Delaware Case

In 1996, DEKALB brought suit in the U.S. District Court for the Northern District of Illinois against Pioneer, Mycogen, AgrEvo, and Syngenta's two predecessor companies, Northrup King Co. (Civil Action No. 96 C 50169) and Ciba-Geigy Corp. (Civil Action No. 96 C 50241) (collectively "1996 Syngenta cases"), for infringement of five DEKALB-owned patents, including U.S. Patent No. 5,538,880 ("the '880 patent"). In 1999, the 1996 Syngenta cases were resolved and dismissed after three years of

litigation that involved extensive fact and expert discovery and construction of the '880 patent claims by this Court.

On May 12, 2004, Monsanto Company, DEKALB's parent company, filed a complaint asserting U.S. Patent No. 4,940,835 ("the '835 patent") against Syngenta in the U.S. District Court for the District of Delaware. Syngenta brought another patent into the case by counterclaiming that U.S. Patent No. 5,188,642 ("the '642 patent") is invalid and not infringed by Syngenta. Both the '835 patent and the '642 patent (collectively "the Shah patents") name Dilip M. Shah, Stephen Rogers, Robert Horsch, and Robert Fraley, all of Monsanto, as inventors and relate to chimeric genes that provide resistance to glyphosate herbicide. [Exhibit A, cover pages of '835 and '642 patents]

On July 27, 2004, DEKALB filed this action asserting infringement of the '880 patent and related U.S. Patent No. 6,013,863 ("the '863 patent) against different Syngenta products than those involved in the 1996 Syngenta cases. The '880 patent and the '863 patent are in the same patent family (collectively "the Lundquist patents"). Both relate to methods of making herbicide resistant corn and name Ronald Lundquist and David Walters as inventors. Those inventors developed the inventions claimed in the Lundquist patents when they were employed by PSRI, a company that DEKALB acquired in the early 1990's. The Delaware court has no experience with the Lundquist patents.

The Lundquist and Shah patents are unrelated patents and claim different subject matter as evidenced by the following chart, which compares independent claim 1 of the Lundquist and Shah patents:

| Pat. 4,940,835 – Shah, et al. | Pat. 6,013,863 – Lundquist et al. |
|---|---|
| 1. A chimeric plant gene which comprises:<br><br>(a) a promoter sequence which functions in plant cells;<br><br>(b) a coding sequence which causes the production of RNA, encoding a chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide, which chloroplast transit peptide permits the fusion polypeptide to be imported into a chloroplast of a plant cell; and<br><br>(c) a 3' non-translated region which encodes a polyadenylation signal which functions in plant cells to cause the addition of polyadenylate nucleotides to the 3' end of the RNA;<br><br>the promoter being heterologous with respect to the coding sequence and adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with the gene. | 1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, wherein said DNA comprises at least a screenable marker gene; (ii) selecting a population of transformed cells expressing the selectable marker gene; and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is expressed so as to impart glyphosate resistance to said transgenic plant and is transmitted through a normal sexual cycle of said transgenic plant to progeny plants. |
| **Pat. 5,188,642 – Shah, et al.** | **Pat. 5,538,880 – Lundquist et al.** |
| 1. A method for selectively controlling weeds in a field containing a crop of planted crop seeds or plants which method comprises the steps of:<br><br>a) planting said crop seeds or plants which are glyphosate resistant as a result of a chimeric gene being inserted into said crop seed or plants, said chimeric gene having<br><br>i) a promoter sequence which functions in plant cells,<br><br>ii) a coding sequence which causes the production of RNA, encoding a chloroplast transit peptide/5-enolpyruvylshikimate-3-phosphate synthase fusion polypeptide, which chloroplast transit peptide permits the fusion polypeptide to be imported into a chloroplast of a plant cell, and<br><br>iii) a 3' non-translated region which encodes a polyadenylation signal which functions in plant cells to cause the addition of polyadenylate nucleotides to the 3' end of the RNA,<br><br>where the promoter is heterologous with respect to the coding sequence and adapted to cause sufficient expression of the fusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with said gene; and<br><br>b) applying to said crop and weeds in said field a sufficient amount of glyphosate to control said weeds without significantly affecting said crop. | 1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea may* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells, and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, and imparts herbicide resistance thereto. |

Thus, the Shah patent claims focus on the components of the claimed chimeric gene and the Lundquist patent claims focus on the steps for making fertile transgenic corn.

**B.     The Illinois Court's History With The Lundquist Family Of Patents**

One of the other cases that DEKALB brought before this Court in 1996 was *DEKALB Corp. v. Pioneer Hi-Bred International, Inc.*, Civil Action No. 96 C 50112.   In that case, this Court conducted a jury trial in February 2001 involving another one of the Lundquist patents, U.S. Patent No. 5,484,956.   That case ended in a hung jury, and the parties were on the verge of retrial when the parties settled.   Consequently, this Court has extensive experience with the technology of the Lundquist patents in addition to its knowledge of the '880 patent and the parties.   That experience is also relevant to the '863 patent, which is related to the '880 patent; it shares the same specification and part of the same file history.   A comparison of independent claim 1 of the '863 and '880 patents, with the common language highlighted, shows the extent to which the issues of claim construction, infringement, and validity will be similar between the two patents:

| Pat. 6,013,863 – Lundquist et al. | Pat. 5,538,880 – Lundquist et al |
|---|---|
| 1. **A process for producing a fertile transgenic** *Zea mays* **plant comprising the steps of (i) bombarding intact regenerable** *Zea mays* **cells with DNA-coated microprojectiles,** wherein said DNA comprises at least a screenable marker gene; **(ii) selecting a population of transformed cells** expressing the selectable marker gene; and **(iii) regenerating a fertile transgenic plant therefrom,** wherein said DNA is expressed so as to impart glyphosate resistance to said transgenic plant and **is transmitted through a normal sexual cycle of said transgenic plant to progeny plants.** | 1. **A process for producing a fertile transgenic** *Zea mays* **plant comprising the steps of (i) bombarding intact regenerable** *Zea may* **cells with DNA-coated microprojectiles,** (ii) identifying or selecting a population of transformed cells, and **(iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through** a complete sexual cycle of said transgenic plant to its progeny, and imparts herbicide resistance thereto. |

Syngenta's Br. at 10-11 states that this Court previously construed the claims of the '880 patent in the Pioneer case. Although true, this statement is misleading because the Court also construed the '880 patent claims in the 1996 Syngenta cases. The Court held a four day Markman hearing which resulted in a claim construction ruling on the claims of the '880 patent. [Exhibit B, Claim Construction Order] The case caption on the order includes the 1996 Syngenta cases. Moreover, Syngenta was represented at the Markman hearing by David Van Dyke, who continues to represent Syngenta in the present case. [Exhibit C, Markman Hearing Transcript at p. 3]

The following terms in the '880 patent were construed by the Court in the 1996 Syngenta cases: "*Zea mays*", "gene", "transgenic corn plant", "comprising", "wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny," "intact regenerable cells", "progeny"[1], "herbicide resistance", and "said DNA." [Exhibit B] Because many of the terms in the '863 patent claims are identical to the terms already construed by the Court in the 1996 Syngenta cases, those issues need not be re-litigated here.

---

[1] As in its motion to dismiss, Syngenta makes another improper attempt to argue the merits of the infringement issues, claiming that it "*never practiced the claimed processes.*" [Syngenta Br. at 11, emphasis in original] However, as DEKALB noted in its opposition to Syngenta's motion to dismiss, Syngenta has admitted that it intends to introduce for commercial sale glyphosate-resistant corn seed in 2005. [Syngenta's Motion to Dismiss at 1] This necessarily means that Syngenta is now engaged in the process of making glyphosate-resistant progeny plants in order to produce sufficient quantities of corn seed for commercial sale next year. This activity constitutes infringement of one or more claims of the patents-in-suit. For example, dependent claim 4 of the '880 patent recites "[a] process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 1 which comprise said DNA." Syngenta's making of progeny plants infringes this claim. The process of making glyphosate-resistant progeny is also one of the steps recited in the '863 patent claims. For example, claim 5 of the '863 patent recites "[t]he process of claim 1 further comprising obtaining transgenic glyphosate resistant progeny plants of subsequent generations from said fertile transgenic plant." In the *Pioneer* case, the Special Master opined that it would not be "unreasonable to require that at least one step of a patented process be carried out during the term of the patent in order to find infringement." [Exhibit D, Report and Recommendation of Special Master Regarding Pioneer's Motion For Summary Judgment That U.S. Patent No. 5,484,956 Is Not Infringed at 9] Syngenta is completing the claimed process by making progeny plants during the term of the '863 patent.

The parties have already conducted extensive discovery on the '880 patent and other Lundquist patents in the 1996 Syngenta cases. Syngenta has taken the depositions of Ron Lundquist and David Walters and other individuals whose work resulted in the Lundquist family of patents. [Exhibit E, cover pages from the depositions of Ron Lundquist, David Walters, Paul Anderson, Nancy Dwan, Kimberly Glassman, Conrad Gold, Julie Kirihara, Richard Krzyzek, Gary Sandahl] That discovery is also relevant to the '863 patent because it shares the same specification as the '880 patent. Thus, discovery in this case will focus on Syngenta's infringing products and possibly a few issues relating to the '863 and '880 patents that were not the subject of the 1996 Syngenta cases.

Based on this Court's long history with the Lundquist family of patents, it would be a waste of judicial resources to litigate anew in another district. If Syngenta's motion to transfer is granted, the Delaware court will have to duplicate this Court's learning curve on the technology and the Lundquist family of patents. Additionally, this case can be resolved more quickly than the Delaware case. Even though it was filed after the Delaware case, this case is further along because of the discovery and rulings from the 1996 Syngenta cases.

## III.    ARGUMENT

### A.    The Interest Of Justice Factor Warrants That This Case Be Litigated In This District

The interest of justice analysis relates to the "efficient administration of the court system." *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 221 (7th Cir. 1986). The most efficient place to litigate this case is in this district, where the Court's experience with the parties, corn transformation technology, and the '880 patent will result in a more

expeditious resolution of this action.  DEKALB filed this case in the Northern District of Illinois because this Court was the first to acquire jurisdiction over the '880 patent[2] and has years of experience dealing with the complex technology involved, not for the reasons that Syngenta asserts.  [*See* Syngenta Br. at 10]  In fact, Syngenta's transfer motion to Delaware appears to be an attempt to walk away from a claim construction that it finds unfavorable.

Because extensive discovery was taken on the '880 patent by Syngenta and the claims of the '880 patent were construed in the 1996 Syngenta cases, discovery in this case will be more focused and it will be ready for trial more expeditiously.  It would be an enormous waste of the parties' and judicial resources to start over in a new district where the court has no knowledge of the Lundquist patents.

In analyzing a motion to transfer, judicial economy is a very important factor, particularly in complex cases like this one.  Courts have recognized the importance of a court's prior familiarity with the facts and issues to judicial economy.  *See, e.g., Carus Corp. v. Greater Texas Finishing Corp.*, 1992 WL 22691, *2 (N.D. Ill. Jan. 31, 1992)(citing *Zurich Ins. Co. v. Raymark Industries, Inc.*, 672 F.Supp. 1102, 1104 (N.D. Ill. 1987).  In *Capitol Records, Inc. v. Optical Recording Corp.*, 810 F.Supp. 1350, 1354 (S.D.N.Y. 1992), the court transferred the case to the court that had prior experience and familiarity with the patents at issue after conducting a trial in a different case involving the same patents.  In another case, *LG Electronics, Inc. v. Asustek Computers*, 126

---

[2] Syngenta's Br. at 9-10 also incorrectly asserts that the Delaware case involving the Shah patents was the first filed case.  The cases cited by Syngenta in support of its first-to-file argument involve the situation where there was a race to the courthouse by both the plaintiff and defendant.  Syngenta cites no case law supporting the proposition that the first-to-file rule should apply here, where Syngenta did not file either of the two cases and where the patents belong to plaintiff Monsanto (Delaware) and plaintiff DEKALB (Illinois) and are unrelated.

F.Supp.2d 414, 424 (E.D. Va. 2000), the district court held that the interest of justice "warrants" a transfer to the district that was familiar with at least one of the patents at issue because it previously rendered a claim construction concerning that patent. Here, the interest of justice factor warrants that this case stay in this district, where the Court has issued a claim construction ruling on the '880 patent, extensive discovery has been conducted on the Lundquist family of patents, and the Court is familiar with the technology at issue.

**B.    Consolidation Of This Case And The Delaware Shah Patent Case Will Not Result In Judicial Economy Or Avoid Inconsistent Decisions**

Transferring this case to Delaware will not result in judicial economy or avoid inconsistent decisions. This case and the Delaware case involve unrelated patents[3] with completely different validity and infringement issues. Infringement is determined by comparing the accused product or method to the patent claims. *Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998)(citation omitted). Although Syngenta's glyphosate resistant corn is at issue in both cases, there will be different legal and factual issues because the Lundquist and Shah patents are unrelated and claim different subject matter. Thus, Syngenta's argument that this case should be transferred to Delaware because both cases involve the same allegedly infringing activity is misleading and unsupported. [Syngenta Br. at 2]

The chart in the background section, *supra*, comparing independent claim 1 from the Lundquist and Shah patents demonstrates how different the infringement inquiry will be for these patents. The infringement issues for the Shah patents are focused on the

---

[3] Syngenta's Br. at 5 incorrectly states that Monsanto has admitted that the two patent cases are interrelated. The fact that Syngenta's antitrust case against Monsanto would lack merit if either the Lundquist patents or Shah patents are valid and enforceable does not show that the Lundquist and Shah patents are related.

components of the claimed chimeric gene ("a promoter sequence," "a coding sequence which causes the production of RNA," "a 3'non-translated region"). By contrast, the Lundquist patent infringement issues are focused on the recited plant transformation steps ("bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles," "selecting a population of transformed cells expressing the selectable marker gene," "regenerating a fertile transgenic plant").

The validity issues will also be different for the unrelated patents. The Lundquist patents and the Shah patents involve different inventors and different technology. Specifically, the Lundquist patents relate to *methods of transforming corn* with DNA that provides herbicide resistance, particularly glyphosate resistance. In contrast, the Shah patents relate to *chimeric genes* that provide glyphosate resistance. The technical and novel aspects of the inventions involve different prior art, different state of the art (the Shah patents were filed five years before the Lundquist patents), and different persons of ordinary skill in the art. Consequently, contrary to Syngenta's Br. at 8-9, the legal and fact issues are different for the Lundquist and Shah patents and there is no risk of inconsistent judgments.

The only area of overlap between these two cases is discovery on Syngenta's activities with respect to its glyphosate resistant corn products. That is an insufficient basis for transfer because discovery on that issue can easily be coordinated for the two cases, resulting in no waste of the parties' or judicial resources. In fact, the parties have already agreed not to duplicate depositions in the two cases. Thus, it is irrelevant that transfer of this case to Delaware would also likely result in coordination of discovery on Syngenta's activities.

The facts of the present case do not warrant a transfer for the purposes of consolidation, and the case law relied upon by Syngenta does not support such a transfer either. In three of the cases cited in Syngenta's Br. at 7-8, transfer was ordered to a district where the same patent was at issue. *See Clear Lam Packaging, Inc. v. Rock-Tenn Co.*, 2003 WL 22012203 (N.D. Ill. Aug. 22, 2003); *A.P.T., Inc. v. Quad Environmental Technologies Corp., Inc.*, 698 F.Supp. 718 (N.D. Ill. 1988); *Carus Corp. v. Greater Texas Finishing, Corp.*, 1992 WL 22691 (N.D. Ill. Jan. 31, 1992). In the two other patent cases cited by Syngenta, *Ellis Corp. v. Jensen USA, Inc.*, 2003 WL 22111100 (N.D. Ill. Sept. 9, 2003) and *Abbott Laboratories v. Selfcare, Inc.*, 1999 WL 162805 (N.D. Ill. Mar. 15, 1999), different patents (the plaintiff's and defendant's) were involved, but the cases were transferred to the court that had more familiarity and history with the controversy. *See Ellis Corp.* at *4; *Abbott Lab.* at *2.

Here, this Court is the one that has extensive knowledge and history with the '880 patent, and that knowledge and history will be relevant to the '863 patent as well. The Delaware court has no substantive knowledge of the Lundquist patents. If the case is transferred to Delaware, that court would have to duplicate this Court's efforts, which would be a waste of judicial resources.

## C.    Neither Venue Is Significantly More Convenient; Thus DEKALB's Choice Of Forum Should Be Determinative

Syngenta admits that the District of Delaware is not a more convenient forum for the parties or witnesses than the Northern District of Illinois. [Syngenta Br. at 13] However, DEKALB's principal place of business is in Illinois, which weighs slightly in favor of Illinois. Additionally, DEKALB's choice of its home forum should be entitled to substantial weight. *Gallery House, Inc. v. Yi*, 587 F.Supp. 1036, 1040 (N.D. Ill.

1984)(citing *Piper Aircraft v. Reyno*, 454 U.S. 235, 102 S.Ct. 252, 70 L.Ed.2d. 419 (1981)); *Store Décor Division of Jas International, Inc. v. Stylex Worldwide Industries, Ltd.*, 767 F.Supp. 181, (N.D. Ill. 1991)(citations omitted). Where the convenience of the parties and witnesses does not significantly support one venue, deference should be given to the plaintiff's choice of forum. *Clear Lam Packaging, Inc. v. Rock-Tenn Co.*, 2003 WL 22012203, *4 (N.D. Ill. 2003)(citing *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 718 (7th Cir. 2002)). For this additional reason, this Court is the proper venue for resolution of this dispute.

## IV.    CONCLUSION

For the reasons set forth above, DEKALB respectfully requests that Syngenta's motion to transfer be denied.

Dated: <u>12-21-04</u>                           Respectfully submitted,

                                               By_____
                                               John J. Holevas
                                               Illinois Bar No. 06193197
                                               WILLIAMS & MCCARTHY
                                               321 West State Street
                                               Rockford, IL   61101
                                               (815) 987-8900

                                               John F. Lynch
                                               Thomas A. Miller
                                               Susan K. Knoll
                                               HOWREY SIMON ARNOLD & WHITE, LLP
                                               750 Bering Drive
                                               Houston, TX   77057
                                               (713) 787-1400

                                               ATTORNEYS FOR PLAINTIFF
                                               DEKALB GENETICS CORPORATION

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and correct copies of DEKALB GENETICS CORPORATION'S OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER were served on this the 21st day of December, 2004, as follows:

David C. Van Dyke                          **VIA FEDERAL EXPRESS**
Ronald D. Fiet
CASSIDAY, SCHADE & GLOOR, LLP
20 N. Wacker Drive, Suite 1040
Chicago, IL  60606


Don O. Burley                              **VIA FEDERAL EXPRESS**
Michael J. Flibbert
Howard W. Levine
FINNEGAN, HENDERSON, FARABOW, GARRETT
& DUNNER, L.L.P.
1300 I Street, N.W.
Washington, D.C.  20005-3315

TAB

1

# United States Patent [19]

## Shah et al.

[11] **Patent Number:** **4,940,835**

[45] **Date of Patent:** **Jul. 10, 1990**

[54] **GLYPHOSATE-RESISTANT PLANTS**

[75] Inventors: **Dilip M. Shah**, Creve Coeur; **Stephen G. Rogers**, Chesterfield; **Robert B. Horsch**; **Robert T. Fraley**, both St. Louis, all of Mo.

[73] Assignee: **Monsanto Company**, St. Louis, Mo.

[21] Appl. No.: **879,814**

[22] Filed: **Jul. 7, 1986**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 792,390, Oct. 29, 1985, abandoned, which is a continuation-in-part of Ser. No. 763,482, Aug. 7, 1985, abandoned.

[51] **Int. Cl.$^5$** ...................... **A01H 1/04**; C12N 15/00; C12N 5/00; C07H 15/12

[52] **U.S. Cl.** ................................. **800/205**; 435/172.3; 435/240.4; 435/320; 536/27; 935/35; 935/47; 935/48; 935/64; 935/67; 800/DIG. 44; 800/DIG. 43; 800/DIG. 26; 800/DIG. 14; 800/DIG. 17; 800/DIG. 63; 800/DIG. 27; 800/DIG. 24; 800/230; 800/DIG. 67

[58] **Field of Search** ...................... 435/172.3, 68, 317, 435/240, 240.4, 320; 536/27; 47/58; 800/1

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,535,060 | 8/1985 | Comai | 435/317 |
| 4,769,061 | 9/1988 | Comai | 71/86 |

#### FOREIGN PATENT DOCUMENTS

0115673  8/1984  European Pat. Off. .............. 935/14

#### OTHER PUBLICATIONS

Smart et al., *J. of Biol. Chem* (1985) 260, 30, pp. 16338–16346.
Lee, T. T., *J. Plant Growth Regul* (1982) 1:37–48.
Jensen, R. A., *Physiol. Plant* (1985) 66:164–168.
Rubin et al., *Plant Physiol.* (1982) 70, 833–839.
Mousdale et al., *Planta* (1985) 163:241–249.
'dAmato, T. A., et al., *Planta* (1984) 162:104–108.
Rothe, G. M., et al. *Planta* (1983) 157:358–366.
Singh et al., *Arch. of Biochem & Bioph.* (1985) 243:2 pp. 374–384.
Saijo et al., *Agric. Biol. Chem* (1979) 43 (7) pp. 1427–1432.
Schmidt et al., *P.N.A.S.* (1983) 80, 2632–2636.

Stalker et al., *J. Biol. Chem* (1985) 260:8 pp. 4724–4728.
Science (1986) 231: 1360–1361.
Biotechnology (1984) Nov., pp. 944.
Cole et al., Weed Research (1983) 23, 173–183.
Rubin et al. *Plant Physiol.* (1984)75, pp. 839–945.
Guilley et al. (1982) "Transcription of CAMV DNA. . ." Cell 30: 763–73.
Mazur et al. (1985) "Cloning Herbicide. . . " World Biotech Rep 2: 97–108.
Goodman et al. (1987) "Gene Transfer in Crop. . ." Science 236: 48–54.
Amrhein et al. (1983) "Biochemical Basis For. . ." FEBS Letters 157: 191–6.
Najziger et al. (1984) "Selection & Characterization. . ." Plant Physiol 76: 571–4.
Vanden Broeck et al. (1985) "Targeting of. . ." Nature 313: 358–63.
Koziel et al. (1984) "A Cauliflower Mosiac Virus. . ." J. Mol. Appl. Genet 2: 549–62.
Rogers et al (1983) Appl. Environ Microbiol 46 : 37–43.
Comai et al. (1983) Science 221: 370–1.

*Primary Examiner*—Charles F. Warren
*Assistant Examiner*—David T. Fox
*Attorney, Agent, or Firm*—Dennis R. Hoerner, Jr.; James W. Williams, Jr.; Larry R. Swaney

[57] **ABSTRACT**

This invention involves a cloning or expression vector comprising a gene which encodes 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS) polypeptide which, when expressed in a plant cell contains a chloroplast transit peptide which allows the polypeptide, or an enzymatically active portion thereof, to be transported from the cytoplasm of the plant cell into a chloroplast in the plant cell, and confers a substantial degree of glyphosate resistance upon the plant cell and plants regenerated therefrom.

The EPSPS coding sequence may be ligated to a strong promoter, such as the 35S promoter from cauliflower mosaic virus, to create a chimeric gene. Such genes can be inserted into plant transformation vectors, and subsequently introduced into plant cells. Plant cells transformed using such genes and plants regenerated therefrom have been shown to exhibit a substantial degree of glyphosate resistance.

**59 Claims, 8 Drawing Sheets**





US005188642A

# United States Patent [19]

## Shah et al.

[11] Patent Number: 5,188,642

[45] Date of Patent: * Feb. 23, 1993

[54] **GLYPHOSATE-RESISTANT PLANTS**

[75] Inventors: **Dilip M. Shah**, Creve Coeur, Mo.; **Stephen G. Rogers**, Brussels, Belgium; **Robert B. Horsch**, St. Louis, Mo.; **Robert T. Fraley**, St. Louis, Mo.

[73] Assignee: **Monsanto Company**, St. Louis, Mo.

[ * ] Notice: The portion of the term of this patent subsequent to Jul. 10, 2007 has been disclaimed.

[21] Appl. No.: **478,794**

[22] Filed: **Feb. 12, 1990**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 879,814, Jul. 7, 1986, Pat. No. 4,940,835, which is a continuation-in-part of Ser. No. 792,390, Oct. 29, 1985, abandoned, which is a continuation-in-part of Ser. No. 763,482, Aug. 7, 1985, abandoned.

[51] Int. Cl.⁵ .......................... A01H 1/00; A01H 5/10; C12P 21/00; C12P 21/04; C12N 15/00; C12N 9/00; A01N 57/00

[52] U.S. Cl. ....................................... 47/58; 435/69.1; 435/69.7; 435/69.8; 435/70.1; 435/172.3; 435/183; 800/205; 800/255; 800/DIG. 14; 800/DIG. 17; 800/DIG. 24; 800/DIG. 26; 800/DIG. 27; 800/DIG. 43; 800/DIG. 44; 935/35; 935/48; 935/67; 935/64; 504/206; 504/205; 504/195; 504/197; 504/117

[58] Field of Search .................... 435/69.1, 172.3, 183, 435/69.7, 69.8, 70.1; 800/205, 255, DIG. 14, DIG. 17, DIG. 24, DIG. 26, DIG. 27, DIG. 43, DIG. 44; 71/86; 47/58; 935/35, 48, 67, 64

[56] **References Cited**

### U.S. PATENT DOCUMENTS

4,940,835  7/1990  Shah et al. .......................... 800/205

*Primary Examiner*—David T. Fox
*Attorney, Agent, or Firm*—Dennis R. Hoerner, Jr.; Howard C. Stanley

[57] **ABSTRACT**

This invention involves a cloning or expression vector comprising a gene which encodes 5-enolpyruvylshikimate-3-phosphate synthase (EPSPS) polypeptide which, when expressed in a plant cell contains a chloroplast transit peptide which allows the polypeptide, or an enzymatically active portion thereof, to be transported from the cytoplasm of the plant cell into a chloroplast in the plant cell, and confers a substantial degree of glyphosate resistance upon the plant cell and plants regenerated therefrom.

The EPSPS coding sequence may be ligated to a strong promoter, such as the 35S promoter from cauliflower mosaic virus, to create a chimeric gene. Such genes can be inserted into plant transformation vectors, and subsequently introduced into plant cells. Plant cells transformed using such genes and plants regenerated therefrom have been shown to exhibit a substantial degree of glyphosate resistance.

**23 Claims, 13 Drawing Sheets**



1. SUSPENSION CULTURE OF MP4 PETUNIA CELLS

2. CONTACT WITH LOW LEVEL OF GLYPHOSATE AND CULTURE SURVIVING CELLS

3. SLOWLY INCREASE LEVEL OF GLYPHOSATE, ISOLATE HIGHLY RESISTANT (Gʳ) CELLS, MP4-G

4. PURIFY EPSPS PROTEIN; DETERMINE AMINO ACID SEQUENCE

5. CREATE RADIOACTIVE DNA PROBES WHICH COULD ENCODE THE AMINO ACID SEQUENCE

6. CREATION OF cDNA FROM PETUNIA mRNA

7. INSERT cDNA INTO CLONING VECTORS

8. USE PROBES TO ISOLATE A CLONING VECTOR HAVING AN EPSPS GENE IN INSERTED FRAGMENT

9. DETERMINE SEQUENCE OF EPSPS GENE, IDENTIFY CLEAVAGE SITES THAT ALLOW PROMOTER TO BE REMOVED FROM CODING SEQUENCE

10. REPLACE EPSPS PROMOTER WITH STRONGER CaMV 35S PROMOTER, TO CREATE CHIMERIC GENE

11. INSERT CHIMERIC GENE INTO DISARMED TI VECTOR, USE VECTOR TO INSERT THE GENE INTO PLANT CELLS

12. GROW TRANSFORMED PLANT CELLS ON GLYPHOSATE

13. REGENERATE AND TEST DIFFERENTIATED PLANTS

TAB

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

DEKALB GENETICS CORPORATION,           )    Civil Actions  96 C 50112
                                       )                   96 C 50114
          Plaintiff,                   )                   96 C 50169
                                       )                   96 C 50239
     v.                                )                   96 C 50241
                                       )                   96 C 50284
PIONEER HI-BRED INTERNATIONAL, INC.,   )                   98 C 50186
MYCOGEN CORPORATION, including its     )
Operating subsidiaries AGRIGENETICS, INC. and )  Judge Philip G. Reinhard
MYCOGEN PLANT SCIENCES, INC.,          )    Magistrate P. Michael Mahoney
CIBA-GEIGY CORPORATION, and NORTHRUP ) Special Master Robert L. Harmon
KING CO. (formerly Sandoz Seeds Co.),  )
                                       )        Transgenic Corn Patent Litigation
          Defendants.                  )

---

DOCKETED

JUL 01 1999

### REPORT AND RECOMMENDATION
### OF SPECIAL MASTER
### REGARDING CLAIM CONSTRUCTION

These seven civil actions are related by the fact that each involves an assertion of

infringement of one or more of four United States patents owned by plaintiff DeKalb Genetics

Corporation (DeKalb). The patents are in the field of genetic engineering and address the

production of transgenic corn. The four principal defendants are Pioneer Hi-Bred International,

Inc. (Pioneer), Northrup King Co. (NK), Ciba Geigy Corporation (Ciba), and Mycogen

Corporation (Mycogen).

In an Order of Reference dated January 4, 1999, the Court appointed the undersigned as

Special Master (SM) in these cases pursuant to Rule 53, FRCP. The specific purpose of the

reference was to have the SM provide a recommended construction of the claims of the patents

in suit. Under the express terms of the Order, the SM has "all of the powers described in Rule 53

of Fed. R. Civ. P., to conduct an evidentiary hearing on the record to hear and recommend to the

PTX 1555

C.A. # 96-C-50112

Court the resolution of all issues of interpretation of the claims of the patents-in-suit, as provided

for in *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995), *aff'd.*, 517 U.S. 370,

116 S.Ct. 1384 (1996)," and "is not limited by any prior rulings of Judge Reinhard or Magistrate

Mahoney."

A four-day hearing was held in Chicago, Illinois on May 25-28, 1999. Live witness

testimony was received from six expert witnesses, each with a Ph.D. in biological science and

each with substantial experience and achievement in technical areas pertinent to the technology

of the patents in suit. Their testimony was helpful in assisting the SM to acquire sufficient

understanding of that technology to inform and enable the claim construction exercise. In

addition, counsel explained the prosecution histories of the patents and attempted to demonstrate

how the transactions reflected there supported their positions on claim interpretation. Extensive

attorney argument was entertained throughout the hearing. Massive written submissions were

filed preceding and subsequent to the hearing. Upon full consideration of all matters raised

during those proceedings, this report is respectfully submitted in response to the Court's directive

to recommend a construction of the claims of the patents in suit.

## GOVERNING LEGAL PRINCIPLES

### The Legal Framework for Claim Construction

Proper claim construction necessarily precedes a determination of whether the claims

read on the accused devices or methods for infringement purposes.[1] Indeed, claim construction

---

[1] E.g., <u>Fonar Corp. v. Johnson & Johnson</u>, 821 F.2d 627, 3 USPQ2d 1109, 1112 (Fed. Cir. 1987)

will normally control the remainder of the decisional process,[2] for it is axiomatic that the claims

must be construed in the same way for infringement that they are for determining validity.[3]

In the Markman case, supra, the Supreme Court held that interpretation of patent claims

is a question for the court, while application of properly construed claims to determine

infringement is a question for the finder of fact, in this case the jury. As a starting point, the

words in a patent claim should be given their ordinary and customary meaning unless it appears

from the specification that the patentee defined them otherwise.[4] Nonetheless, when technical or

scientific terms in the claims require definition or explanation or understanding in the course of

deciding whether the claims are infringed, it is the court's responsibility to undertake that task.[5]

In discharging its Markman responsibility, the court must inevitably decide what the scope

of the underlying evidentiary inquiry will be. The Federal Circuit explained this decisional

process in Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 39 USPQ2d 1573 (Fed. Cir.

1996). Ordinarily, the court should confine itself, if possible, to an examination of the intrinsic

patent documents: the patent itself and its prosecution history. In most situations, an analysis of

the intrinsic evidence alone will resolve any ambiguity in a disputed claim element. In those

cases where the public record unambiguously describes the scope of the patented invention,

reliance on any extrinsic evidence is improper. Only if there is still some genuine ambiguity in

the claims, after consideration of all available intrinsic evidence, should the court resort to

extrinsic evidence such as expert testimony. And even if the judge decides to hear all possible

evidence before construing the claims, expert testimony inconsistent with the intrinsic evidence

---

[2] Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1 USPQ2d 1593, 1597 (Fed. Cir. 1987).
[3] E.g., Intervet America, Inc. v. Kee-Vet Labs., Inc., 887 F.2d 1050, 12 USPQ2d 1474, 1476 (Fed. Cir. 1989). It is recommended that the jury be so instructed.
[4] E.g., York Prods. Inc. v. Central Tractor F&F Center, 99 F.3d 1568, 40 USPQ2d 1619, 1622 (Fed. Cir. 1996). Statements in the prosecution history are also pertinent; for example, a clear disavowal of claim coverage can limit the construction of the claim. Id. at 1624.
[5] Fromson v. Anitec Printing Plates Inc., 132 F.3d 1437, 45 USPQ2d 1269, 1271 (Fed. Cir. 1997).

should be accorded no weight. Extrinsic evidence in general, and expert testimony in particular,

may be used only to help the court come to the proper understanding of the claims; it may not be

used to vary or contradict the claim language. Nor may it contradict the import of other parts of

the specification. Nor may the inventor's subjective intent as to claim scope, when unexpressed

in the patent documents, have any effect.

As indicated, the parties called six highly articulate and qualified experts in biological

science. In considering the evidence adduced through these witnesses, the SM was constantly

mindful of the Federal Circuit's clear direction in Bell & Howell Doc. Man. Prod. Co. v. Altek

Sys., 132 F.3d 701, 45 USPQ2d 1033, 1038 (Fed. Cir. 1998):

> Once a dispute over claim construction arises, "experts" should also not be heard to inject
> a new meaning into terms that is inconsistent with what the inventor set forth in his or her
> patent and communicated, first to the patent Examiner and ultimately to the public.
> Patents should be interpreted on the basis of their intrinsic record, not on the testimony of
> such after-the-fact "experts" that played no part in the creation and prosecution of the
> patent. * * * Use of expert testimony to explain an invention may be useful. But reliance
> on extrinsic evidence to interpret claims is proper only when the claim language remains
> genuinely ambiguous after consideration of the intrinsic evidence, *Vitronics*, 90 F.3d at
> 1584, 39 USPQ2d at 1578, i.e., when the intrinsic evidence is "insufficient to enable the
> court to construe disputed claim terms." Id. at 1585, 39 USPQ2d at 1579. Accordingly,
> any expert testimony that is inconsistent with unambiguous intrinsic evidence should be
> accorded no weight. * * *

These admonitions have conditioned the methodology employed in this proceeding. The

parties have submitted extensive extrinsic evidence, and the SM has been willing, within reason,

to consider all such evidence. In the end, however, apart from whatever benefit this evidence

may have provided in gaining an understanding of the technology at hand, it has not been relied

upon in construing the claims.[6] All potential ambiguities in the claim language itself were

resolvable by reference to the intrinsic patent documents.

---

[6] See Mantech Environmental Corp. v. Hudson Environmental Serv. Inc., 152 F.3d 1368, 47 USPQ2d 1732, 1737
(Fed. Cir. 1998), where the Federal Circuit held that "the district court was legally correct both in admitting and

The SM is also mindful of the admonition of the Federal Circuit that "claim construction is

not an obligatory exercise in redundancy," and that it is unnecessary to repeat or restate every

claim term in order to comply with the <u>Markman</u> directive that claim construction is a matter for

the court.[7]  Such an approach would carry the very real potential of confusing rather than

enlightening the jury.[8]  Thus, *where terms are expressly defined in the patent specification, it is*

*sufficient simply to refer the jury to that definition*; the court can decide at the time of trial

whether explanatory technical testimony would be necessary or, indeed, helpful at all.  And

where a term is not defined or used in a special way in the specification, and is otherwise

unambiguous, the jury should be instructed to give the term its ordinary meaning and will

presumably require no additional assistance.

It is also important to understand that claim construction is an obligation of the court that is

independent of the views asserted by the adversary parties.[9]  Among them, the parties have

requested consideration and construction of many, but not all, of the elements of the claims of

the patents in suit.  The SM has considered each claim as a whole, and each element of each

claim, and has recommended *a specific interpretation of those terms and phrases, and only those*

*terms and phrases, that require construction.*  Accordingly, to the extent various claim elements

are not addressed in this report, it may be assumed that the SM is recommending that they be

---

accepting the testimony of the parties' expert witnesses 'for the purpose of background in the technical area at issue,'
* * * and then basing its claim construction solely upon intrinsic evidence. Although this information always may
be admitted by the trial court to educate itself about the patent and the relevant technology, the claims and the
written description remain the primary and more authoritative sources of claim construction. Thus, they always must
be considered and where clear must be followed." See also <u>Key Pharm. Inc. v. Hercon Labs. Corp.</u>, 161 F.3d 709,
48 USPQ2d 1911 (Fed. Cir. 1998).

[7] <u>United States Surgical Corp. v. Ethicon, Inc.</u>, 103 F.3d 1554, 41 USPQ2d 1225, 1236 (Fed. Cir. 1997).

[8] For example, repeatedly instructing a jury that an ordinary English word does not really mean what they think it
does, but instead has the meaning of some synonym, can only cause confusion. If they meant not the one but the
other, why did the inventors and their attorneys not use the other? This is a question no jury should have to concern
itself with.

[9] <u>Exxon Chem. Patents Inc. v. Lubrizol Corp.</u>, 64 F.3d 1553, 35 USPQ 1801, 1802 (Fed. Cir. 1995).

grouped in the category of claim elements that need no construction, and that would be subject to

a general jury instruction concerning application of ordinary English usage. Similarly, this

report is not to be viewed as reflecting an acceptance or endorsement by the SM of any proposed

construction of either party, unless it expressly so states. Once again, if the report is silent as to a

particular element, that means only that the SM is suggesting that no construction is necessary,

regardless of what a party may have offered as a proposed construction.

### The Timing of the Inquiry

There is a threshold question in the claim construction analysis that requires some

consideration. It is the person of ordinary skill in the field of the invention through whose eyes

the claims are construed. Such person is deemed to read the words used in the patent documents

with an understanding of their meaning in the field, and to have knowledge of any special

meaning and usage in the field. The inventor's words that are used to describe the invention –

the inventor's lexicography – must be understood and interpreted by the court as they would be

understood and interpreted by a person in that field of technology. Thus the court starts the

decisionmaking process by reviewing the same resources as would that person, viz., the patent

specification and the prosecution history. These documents have legal as well as technological

content, for they show not only the framework of the invention as viewed by the inventor, but

also the issues of patentability as viewed by the patent Examiner.[10]

But this does not resolve the timing of the inquiry. An important question remains: as of

what date must the court step into the shoes of the person skilled in the art? To put it another

way, what is the state of knowledge, viewed chronologically, possessed by such a person when

the claim construction exercise is performed? Surprisingly, the law on this seemingly

---

[10] Multiform Desiccants Inc. v. Medzam Ltd., 133 F.3d 1473, 45 USPQ2d 1429, 1432 (Fed. Cir. 1998).

fundamental point is not crystal clear. In Markman[11] itself, the Federal Circuit said "the focus is

on the objective test of what one of ordinary skill in the art at the time of the invention would

have understood the term to mean." But it is not clear that this was intended to define a rigid

time frame for conducting the analysis. In a more recent case the court remarked that an inventor

cannot "by later testimony change the invention and the claims from their meaning at the time

the patent was drafted and granted."[12] Even more recently, the court observed that "the literal

meaning of a claim is fixed upon its issuance."[13] In point of fact, it does not appear that the

Federal Circuit has ever squarely addressed the proper timing of the claim construction inquiry in

a context where the answer might be outcome-determinative.

It makes a certain amount of sense to use the issue date, or perhaps even the filing date, as

the chronological viewing post in determining the understanding of the hypothetical person of

ordinary skill in the art. After all, the give and take of prosecution has not taken place as of the

date of filing or date of invention. The ultimate language of the issued claims usually has not

even been formulated until some prosecution has taken place – sometimes not until late in the

prosecution. Indeed, as of the actual date of invention, claims and claim language are not part of

the picture. Certainly it would not seem unreasonable, for purposes of claim construction, to

permit the hypothetical person of skill to be regarded as possessing prior art information that

could be acquired at least during the period between actual invention and the filing of the patent

application.

---

[11] Markman v. Westview Instr., Inc., 52 F.3d 967, 34 USPQ2d 1321, 1335 (Fed. Cir. 1995).
[12] Voice Tech. Group Inc. v. VMC Sys. Inc., 164 F.3d 605, 49 USPQ2d 1333, 1341 (Fed. Cir. 1999). A pair of
recent cases from the District of Kansas has also used the issue date as the pertinent time for determining what the
claims would have meant to a person of ordinary skill in the art. KCJ Corp. v. Kinetic Concepts, Inc., 30 F.Supp.2d
1319, 1323 (D. Kan. 1998); Hay & Farage Indus. v. New Holland North Am. Inc., 25 F.Supp.2d 1170, 1173 (D.
Kan. 1998).
[13] Al-Site Corp. v. VSI Int'l Inc., — F.3d —, 50 USPQ2d 1161, 1168 (Fed. Cir. 1999).

Nonetheless, the SM has concluded that, given the importance of the date of invention in other assessments of the knowledge of one skilled in the art,[14] it would not be prudent to brush aside Markman's focus upon that date as mere dictum.   Clearly, prosecution history is an important source of intrinsic evidence in interpreting claims because it is a contemporaneous exchange between the applicant and the Examiner.  The public has the right to rely on an applicant's remarks made in seeking allowance of claims.[15]  But the prosecution history can be given full play by simply viewing it as would a hypothetical person of ordinary skill in the art who, though reading it later, was basing an understanding of it upon knowledge of the scope and content of the prior art as it existed at the time of invention.

This conclusion, however, raises another consideration, viz.: what is the date of invention and, if it is demonstrated to precede the filing date, does that time difference matter in construing the claims?  Mycogen suggests (Mycogen's Memorandum Regarding the Date of Claim Construction, handed up during the hearing) that "it would seem prudent to resolve the proper date of invention prior to any construction of the claims in this case." In its post-hearing memorandum, Ciba says that it "does not propose that the SM determine, as a factual matter, the actual dates of invention, such as for purposes of Section 102(g)." Pioneer, who asserts that the invention date is the appropriate vantage point, but that the filing date may sometimes be used as an approximation, does not comment on whether the date of invention needs to be decided at this juncture.  (Pioneer's Brief Regarding the Proper Date for Evaluating Claim Construction)

---

[14] E.g., Sensonics, Inc. v. Aerosonic Corp., 81 F.3d 1566, 38 USPQ 1551, 1554 (Fed. Cir. 1996) (obviousness under 35 U.S.C. §103). But inquiries under §112 tend to focus upon the filing date. E.g., Amgen, Inc. v. Chugai Pharm. Co., 927 F.2d 1200, 18 USPQ2d 1016, 1024 (Fed. Cir. 1991) (best mode); Vas-Cath Inc. v. Mahurkar, 935 F.2d 1555, 19 USPQ2d 1111, 1119 (Fed. Cir. 1991) (§112¶1 generally); Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 231 USPQ 81, 94 (Fed. Cir. 1986) (enablement).

[15] Desper Prods. Inc. v. Qsound Labs, Inc., 157 F.3d 1325, 48 USPQ2d 1088, 1096-97 (Fed. Cir. 1998).

DeKalb, who contends that the filing date is the only appropriate date, is likewise silent on the subject.

Clearly, the record is not sufficiently developed at this point to permit an informed and reasoned decision on the actual date of invention for the several inventions claimed in the patents in suit. Moreover, any such effort, if it involved fact-finding (which it surely must), would invade the province of the jury with respect to matters such as prior invention under 35 U.S.C. §102(g) and antedating prior art under §§102(a) and (e).[16] However, Ciba points out that, during the prosecution of the Lundquist patents, the applicants submitted affidavits under Rule 131,[17] seeking to antedate certain prior art by establishing an earlier date of invention. The earliest date in question was May 1989, and the Rule 131 showing was simply directed at establishing a date of invention sometime prior to that date. Accordingly, it would seem reasonable to select, as a date upon which to assess the knowledge of one of ordinary skill in the art, the time frame just prior to May of 1989. Although no similar showing was made during prosecution of the Adams '520 patent, the technology is so similar, and the chronology so close (Lundquist originally filed in January of 1990 and Adams in April of 1990), that it is not unreasonable under the circumstances to use that date for the '520 patent as well.

The claim construction analysis in this report has been conducted, therefore, by seeking to understand what the claims would have meant to a person of ordinary skill in the art, having knowledge of the art as it existed as of May 1989.

---

[16] Priority of invention is a question of law to be determined based upon underlying factual determinations. E.g., Innovative Scuba Concepts, Inc. v. Feder Indus., Inc., 26 F.3d 1112, 31 USPQ2d 1132, 1134 (Fed. Cir. 1994).

[17] Rule 131 (37 C.F.R. §1.131) provides an ex parte mechanism whereby a patent applicant may antedate subject matter in a reference, even if the reference describes the same invention that is claimed by the applicant, provided that the same invention is not claimed in the reference when the reference is a United States patent. The disclosure in a reference United States patent does not fall under 35 U.S.C. §102(g) but under 35 U.S.C. §102(a) or (e), and thus can be antedated in accordance with Rule 131. But when the subject matter sought to be antedated is claimed in the reference patent, Rule 131 is not available and an interference must be had to determine priority. In re Zletz, 893 F.2d 319, 13 USPQ2d 1320, 1322-23 (Fed. Cir. 1989).

Report and Recommendat    pecial Master Regarding Claim Construction                      Page 10
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

## The Written Description Requirement

A general observation regarding defendants' positions on some of the claim construction

questions addressed in this report seems to be in order.  In several instances, they appear to be

suggesting nothing more nor less than a straightforward importation of limitations from the

specification into the claim.  This is, of course, forbidden.[18] Although the specification may well

indicate that certain embodiments are preferred, particular embodiments appearing in the

specification will not be read into the claims when the claim language is broader than such

embodiments.[19] If everything in the specification were required to be read into the claims, or if

structural claims were to be limited to devices operated precisely as a specification-described

embodiment is operated, there would be no need for claims.  Nor could an applicant, regardless

of the prior art, claim more broadly than that embodiment.[20]

But defendants' fundamental argument does raise concerns that may have to be addressed

outside the strict context of claim construction.  What they seem truly to be suggesting is that, in

some instances, there is no support in the patent specification for the claimed invention.  In other

words, the argument is that DeKalb is claiming more broadly (or even differently) than its patent

disclosures permit.  This argument cannot be lightly dismissed.

The first paragraph of 35 U.S.C. §112 contains what has become known as the "written

description" requirement. This provision, which is distinct from the enablement and best mode

requirements, serves to ensure that the inventor had possession, as of the filing date of the

application, of the specific subject matter later claimed. Put another way, the applicant must

---

[18] E.g., Intervet, supra note 3, 12 USPQ2d at 1476.

[19] Electro Med. Sys. S.A. v. Cooper Life Sciences, Inc., 34 F.3d 1048, 32 USPQ2d 1017, 1021 (Fed. Cir. 1994).

[20] SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 227 USPQ 577, 585 (Fed. Cir. 1985).

convey with reasonable clarity to those skilled in the art that he or she was in possession of the

invention claimed.[21]

The Federal Circuit appears to be in the early stages of development of a doctrine resting

upon the principle that when the preferred embodiment is fairly described in the specification as

the invention itself, the claims are not necessarily entitled to a scope broader than that

embodiment.[22] The recent decision of the Federal Circuit in Gentry Gallery, Inc. v. Berkline

Corp., 134 F.3d 1473, 45 USPQ2d 1498 (Fed. Cir. 1998), is the latest clear exemplar of this

doctrinal trend.[23] As the court put the matter in Gentry, 45 USPQ2d at 1503:

> It is a truism that a claim need not be limited to a preferred embodiment.
> However, in a given case, the scope of the right to exclude may be limited by a narrow
> disclosure. * * *
> In sum, the cases * * * do not stand for the proposition that an applicant can
> broaden his claims to the extent that they are effectively bounded only by the prior art.
> Rather, they make clear that claims may be no broader than the supporting disclosure,
> and therefore that a narrow disclosure will limit claim breadth.

At first glance, this language would seem to provide some support for defendants' position on

construction of some claim elements. But one must be careful to observe precisely what it was

that the court actually did about the perceived discrepancy between disclosure and claim in

Gentry. Rather than treat the matter as a claim construction issue, or even an infringement issue,

the court there analyzed it as a question of compliance with the written description requirement

of 35 U.S.C. §112¶1. And properly so, for the evaluation of claim breadth versus fullness of

disclosure has no determinative role to play in a claim construction exercise. It is of course true

that claims should be construed, where possible, to preserve their validity.[24] But it is equally true

---

[21] E.g., In re Alton, 76 F.3d 1168, 37 USPQ2d 1578, 1581 (Fed. Cir. 1996).

[22] See Modine Mfg. Co. v. United States ITC, 75 F.3d 1545, 37 USPQ2d 1609, 1612 (Fed. Cir. 1996).

[23] See also Fromson v. Anitec Printing Plates Inc., 132 F.3d 1437, 45 USPQ2d 1269, 1274-75 (Fed. Cir. 1997);
Vehicular Tech. Corp. v. Titan Wheel Int'l, Inc., 141 F.3d 1084, 46 USPQ2d 1257 (Fed. Cir. 1998).

[24] E.g., Modine, supra note 242 37 USPQ2d at 1617. Indeed, the purpose of restricting the scope of claims through
the reverse doctrine of equivalents (a doctrine somewhat akin to the one under consideration) often is to preserve the

that it is improper to attempt to avoid invalidity by importing claim limitations from narrower claims or even from the specification.[25] The courts will not save claims by redrafting them with extraneous limitations.[26]

That being the case, the real Gentry issue that may emerge here is not whether the patent claims must be construed as limited to the materials and techniques actually disclosed, but whether the inventors of the patents provided a written description adequate to convey to a skilled artisan that they had possession of a broader or different invention than that.[27] Such a question, however, is one of validity, a topic that is beyond the scope of this report.

## THE PATENT TECHNOLOGY

The technology at hand is genetic engineering. Only the most rudimentary understanding of high-level principles of molecular biology is required in order to analyze the claim construction issues presented in this case.

Each of the thousands of different protein molecules that characterize a complex organism is a precise sequence of amino acids. There are approximately twenty naturally occurring amino acids. Deoxyribonucleic acid (DNA), which contains the genetic information for living things, is found in the chromosomes of cells. The DNA molecule is an enormous structure built from sequential combinations of four smaller molecules (bases) linked together to form the DNA chain. It is the sequencing of these bases along the DNA strand that encodes the

---

validity of claims with respect to their original intended scope. Texas Instr., Inc. v. United States ITC, 846 F.2d 1369, 6 USPQ2d 1886, 1889 (Fed. Cir. 1988).

[25] E.g., Environmental Designs, Ltd. v. Unocal, 713 F.2d 693, 218 USPQ 865, 871 (Fed. Cir. 1983); Kalman v. Kimberly-Clark Corp., 713 F.2d 760, 218 USPQ 781, 788 (Fed. Cir. 1983).

[26] E.g., Corning Glass Works v. Sumitomo Elec. U.S.A., Inc., 868 F.2d 1251, 9 USPQ2d 1962, 1966 (Fed. Cir. 1989).

[27] In a very recent case, the Federal Circuit indicated that Gentry "considers the situation where the patent's disclosure makes crystal clear that a particular (i.e., narrow) understanding of a claim term is an 'essential element

genetic information required to produce a particular sequence of amino acids and, thereby, a

particular protein. Thus, a gene may be thought of as a segment of DNA that encodes for a

particular protein. Each protein performs a unique biological function and confers on the

organism the traits that distinguish it from other organisms.[28]

It may immediately be seen that it might be desirable to incorporate genetic information

encoding a protein that confers a useful or beneficial trait in one organism into another organism

that does not naturally include that gene. This has become a reality in the rapidly-advancing

field of genetic transformation. The specific aspect of that field addressed by the patents in suit

is the production of transgenic corn. The patents and the testimony of the witnesses at trial

reveal some of the significant problems faced by early researchers in the field. Taken together,

the pose the complex question: How to get the non-native or heterologous DNA into the corn and

ensure that it expresses as a heritable trait? The complex story of how these problems were

overcome, and by whom, while it may become important at the plenary trial of these cases, need

not be recounted here. The specific technology necessary to enable construction of the claims

can be described adequately by reference to the preferred techniques employed by the inventors

of the patents in suit.[29]

In general, the heterologous DNA is introduced into the target corn cells by a

microprojectile bombardment process, also referred to as a biolistic process. In this technique,

very small particles of a biologically inert material, such as tungsten or gold, are coated with the

DNA of interest. When the coated particles are accelerated toward the target cells, some

---

of [the inventor's] invention.'" <u>Johnson Worldwide Assoc. Inc. v. Zebco Corp.</u>, — F.3d —, 50 U.S.P.Q.2d 1607, 1613 (Fed. Cir. 1999).

[28] The '520 patent defines "genotype" as the genetic complement of an organism, and "phenotype" as traits exhibited by an organism resulting from the interaction of genotype and environment. (C13L13, 31-32)

[29] It must be kept in mind, of course, that claims can be, and often are, broader than the preferred embodiment. See notes 18-27 and accompanying text, supra.

Case 1:05-cv-00355-SLR    Document 88-10    Filed 06/03/2005    Page 31 of 31

Report and Recommendation .  .ecial Master Regarding Claim Construction                    Page 14
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

particles are able to enter the cells, releasing the DNA so that it has a chance to integrate with the native DNA. ('956 patent, C10L38-57; '520 patent, C10L24-47) Although the patents acknowledge other techniques for transferring heterologous DNA, e.g. Agrobacterium infection, electroporation, and polyethylene glycol-mediated transformation ('956 patent, C4L8-12; '520 patent, C10L13-23), all of the patents clearly identify microprojectile bombardment as the preferred technique.

As will be seen, one of the large issues of claim construction has to do with the target of the bombardment.  In the preferred embodiment, a culture is initiated using immature corn embryos.  These are placed, embryo axis down, in a conventional solid culture medium containing a hormone such as 2,4-D.  Under appropriate conditions, the corn embryo cells begin to dedifferentiate into a proliferating mass of cells or tissue called "callus."  The callus forms on an area of the upper side of the embryo called the "scutellum."  The goal is to produce a friable, fast growing, embryogenic callus capable of differentiating into somatic embryos.

Once suitable callus tissue is obtained, it is subjected to the bombardment process. During this process, some cells will not receive any of the heterologous DNA, some will be destroyed by the microprojectiles, and some will be transformed.  The next task is to separate, or "select" the transgenic cells or tissues for further processing.  This is preferably accomplished by introducing into the target cells during transformation a "selectable marker gene" that enables selection of those target cells and tissues that also contain the heterologous DNA of interest.  For example, the so-called "bar" gene (originating in Streptomyces species) encodes for phosphinothricin acetyl transferase (PAT), which inactivates the active ingredient in the herbicide bialaphos.  Exposure of post-bombardment callus to the herbicide will enable separation of the successfully transformed cells from those that are unchanged.  In other words,