demonstrated. Such an argument is unrealistic. No patentee would limit claims to transgenic plants of potential commercial value to a single generation of transformant. No matter how a claim is worded, any language that was not limited to a single generation of descendent must have a scope similar to DEKALB's construction of progeny. Defendants' argument implies that a patentee could never draft a valid claim covering more than one generation of descendant, or alternatively must wait for many years after production of the R0 transformant to file a patent application which demonstrated transmission to as many generations of descendants as were claimed. This would present an insurmountable barrier to any patents directed to production of transgenic progeny.

Accordingly, if defendants' restrictive interpretation is to rule, it must be mandated by some clear and unequivocal transaction in the prosecution histories.

During prosecution of the '880 patent, the Examiner rejected application claims 33 and 35 as indefinite on the grounds that they were substantial duplicates of claim 31. (SM10-52) These claims correspond to claims 5(31), 7(33), and 9(35) of the '880 patent. In response, the applicants pointed out that the claims were not duplicative, in that claim 31 results in an R1 progeny, claim 33 an R2 progeny, and claim 35 an R3. (SM1055) Defendants seize upon this transaction as representing a concession on the part of the applicants that the claims were limited to those generations. This, in the opinion of the SM, is not a fair assessment of the transaction. It is much more likely that a person of ordinary skill in the art, having read and understood the '880 patent, and having gained an appreciation that the intent of the applicants was to establish a transgenic line through a conventional breeding program, would have reached a different conclusion. Such a person would, in the opinion of the SM, have understood that the applicants were merely pointing out how the claims differed, rather than attempting to define their complete scope. The differences were correctly noted: claim 33 did not cover R1 and claim 35 did not cover R1 and R2. But to transmute that showing into a concession that claim 31 covered only R1 and claim 33 only R2 and claim 35 only R3, is more than the language or circumstances can support.

## Insect or Herbicide Resistance

The claims of the Lundquist patents all require, in one fashion or another, that the heterologous DNA confer herbicide resistance or insect resistance to the regenerated plant or its progeny. Ciba and Pioneer take issue with DeKalb's construction of these terms.

Herbicide resistance. Independent claim 1 of the '877 patent requires that the R0 plant be capable of imparting herbicide resistance to its progeny. So, too, with independent claim 1 of the '880 patent. The dependent claims of that patent that address the production of progeny then require that characteristic to be expressed in the progeny plants.

Ciba and Pioneer urge that "herbicide resistance" be construed to mean (1) resistance at the plant level rather than the cellular level, and (2) resistance to chemicals sold to farmers for weed control at the concentrations and levels of application in which they are used to kill whole plants (Ciba) or applied at real-world levels under field conditions (Pioneer). DeKalb's position is that herbicide resistance is phenotypic trait of a transgenic corn plant which allows the cells of the plant to survive or grow in the presence of a herbicide which could kill or stunt the growth of nontransgenic plant cells; any herbicide will do, and field conditions are not required.

In the opinion of the SM, the claim language is clear and unambiguous, and nothing in the patent specifications or prosecution histories limits the construction that it should receive. The claims plainly do not require that the herbicide be a chemical that is sold to farmers for that purpose, nor do they require that it resistance to the herbicide be assessed under field conditions. These conclusions are confirmed by the statement in the Lundquist patents that the "transgenic plants may have many uses in research or breeding." (E.g., '877 patent, C11L62-63)

The claims also plainly require that progeny corn plants (and not merely the callus cells from which they were derived) exhibit the trait in question, but they do not exclude evaluation of

Case 1:05-cv-00355-SLR    Document 88-12    Filed 06/03/2005    Page 3 of 42

Report and Recommendation of Special Master Regarding Claim Construction          Page 45
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

this condition by assessment at some level other than a whole plant growing in the field or

greenhouse. Indeed, various techniques were employed in the Lundquist patents for evaluating

the presence of the hygromycin resistance trait in R0 and R1 plants: direct testing by Southern

blot in both R0 and R1, and root elongation bioassay and etiolated leaf bioassay for R1. (E.g.,

'880 patent, C17L39-C18L57) None of these involved application of a herbicide at "real-world

levels under field conditions."

Defendants argue that the claims must exclude antibiotics such as hygromycin because

they are not chemicals sold to farmers for herbicidal use. But this argument allows no room for

*the fact that the '880 and '877 patents also disclose and claim transformation with selectable*

marker genes, such as the "hygromycin B phosphotransferase (HTP) coding sequence , which

may be derived from *E. coli.*" (E.g., '877 patent, C6L54-56) Claim 4 of the '877 patent specifies

that the heterologous DNA includes a selectable marker gene and claim 5 requires that the claim

4 gene impart herbicide resistance to the R0 plant. This claim program supports the conclusion

that claim 1 would be satisfied by transformation with a selectable marker gene that imparts

herbicide resistance. The examples described in the specification are all concerned with

hygromycin resistance gene transformations.

The prosecution histories support the conclusion that antibiotics, such as hygromycin,

that exhibit herbicidal activity, are among the agents contemplated by the term "herbicidal

resistance." During the prosecution of the '956 patent (which does not claim herbicidal

resistance), the applicants asserted (SM137) that the term "herbicide resistance" is art-

recognized, and referred to a list of herbicides in the specification (C9L20) that included

methotrexate, a metabolic inhibitor that was characterized as a human drug by defendants'

expert, Dr. Goodman. (Tr. 1035) In the prosecution of the '877 patent, the Examiner at one point

Case 1:05-cv-00355-SLR    Document 88-12    Filed 06/03/2005    Page 4 of 42

Report and Recommendation of Special Master Regarding Claim Construction                Page 46
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

indicated that "it may be nothing more than a matter of semantics as to whether hygromycin can

be considered a herbicide," although he was troubled by the lack of evidence that the expression

of hygromycin, as taught in the specification, would satisfy the limitation of herbicide resistance

in a corn plant. (SM724)  In his reasons for allowing the patent, however, the Examiner

concluded that the hygromycin example in the patent, and the "general discussion of art known

and available DNA sequences, including herbicide resistance as a type of selectable or

screenable marker, provides a sufficient written description of whole plants produced by the

claimed process." (SM858)  In the prosecution of the '520 patent, the same Examiner remarked

that the '877 application was directed to expression of the hygromycin gene "which similarly

confers herbicide resistance to the plants and the progeny produced of that methodology."

(SM1332)  In short, the prosecution histories support the conclusion that "herbicide" is not

limited to chemicals sold to farmers as herbicides, but simply means agents that exhibit

herbicidal activity against corn cells.

Resistance is required, however.  Neither the claims nor the specification specify how

much resistance is required, and it is clear that the term is used qualitatively.  It is logical to

conclude that more resistance is required, when evaluated against the same herbicidal agent in

the same context (be it as a selectable marker gene or an agriculturally beneficial characteristic

of a corn plant growing in a farmer's field), than the same plant without the transgene.  It is

recommended that the jury be instructed that "herbicide resistance" means that the plant has

more resistance to an agent having herbicidal activity, when applied to plant material, than the

same plant that does not have the transgene under the same conditions of application and plant

material.

Case 1:05-cv-00355-SLR    Document 88-12    Filed 06/03/2005    Page 5 of 42

Report and Recommenda.   .t of Special Master Regarding Claim Constı ...ion          Page 47
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

Insect resistance. The claims of the '956 patent specify a R0 plant containing DNA
encoding BT endotoxin, wherein the DNA "is expressed so that the plant exhibits resistance to
an insect and wherein said expression is not present in said plant not containing" the DNA. This
language, by its very terms, requires that the R0 plant, which is required to be fertile and
transgenic, exhibit the phenotypic characteristic of insect resistance. The claims of the other
Lundquist patents are somewhat different. Independent claim 6 of the '877 patent requires only
that the R0 plant be capable of imparting insect resistance to its progeny. So, too, with
independent claim 10 of the '880 patent. Again, the dependent claims of that patent that address
the production of progeny require that characteristic to be expressed in the progeny plants.

        Ciba and Pioneer urge that "insect resistance" be construed to mean (1) resistance at the
plant level rather than the cellular level, and (2) resistance to insect pests of corn rather than just
any insect. Pioneer goes further and argues that the plants must "kill actual corn pests, namely,
the European corn borer, under field conditions." DeKalb's position is that any insect will do,
and that field conditions are not required; that the term requires insect resistance to be assessed
when insects consume cells of the plant.

        Again, the claim language is clear and unambiguous, and nothing in the patent
specifications or prosecution histories impacts the construction that it should receive. The claims
plainly require that corn plants exhibit the trait in question, not just callus cells from which the
plants were derived. The claims just as plainly do not require that the insect be a European corn
borer, or any other generally recognized corn pest. Nor do they require assessment of resistance
under field conditions. The latter conclusions are confirmed by the statement in the Lundquist
patents that the "transgenic plants produced herein are expected to be useful for a variety of
commercial and research purposes." (E.g., '956 patent, C14L18-19)

What the claims do require, however, is "resistance," and although the claims, specifications, and prosecution histories do not require insect death, there must be some benchmark against which to assess that trait. Again, the most logical construct is to compare the transgenic plant with the same plant that does not contain the heterologous DNA. Accordingly, it is recommended that the jury be instructed that "insect resistance" means that the plant has more resistance to an insect, when the insect consumes or otherwise attacks plant material, than the same plant that does not have the transgene, under the same conditions.

## Heterologous DNA Encoding BT Endotoxin

The claims of the '956 patent call for the use of "heterologous DNA encoding *Bacillus thuringiensis* endotoxin. Pioneer contends that this language is limited to a native BT gene from one of the 40,000+ strains of *Bacillus thuringiensis*. It says that the language cannot be read to cover plants containing DNA that is chemically manipulated,[57] truncated, or shortened, or DNA that merely encodes fragments of the full-length, native BT endotoxin.

This suggested construction is not supported by the intrinsic evidence. To the contrary, the '956 specification makes it clear that heterologous DNA encompasses "synthetic, semi-synthetic, or biologically derived DNA," including "modified genes" and "portions of genes." (C6L45-52) Moreover, the claim language itself does not require native DNA from *Bacillus thuringiensis*, but rather any DNA that encodes BT endotoxin. Reading the claim as a whole, in light of the specification, compels the conclusion that BT endotoxin means a protein that a person of ordinary skill in the art would recognize as a BT endotoxin, in terms of substantial

---

[57] For example, so-called "codon-optimized" DNA, which involves the rewriting of the DNA sequence of a gene derived from a foreign source, such as a bacterium, so that it can be better utilized by the cellular machinery of the recipient plant. (Tr. 914-16)

similarity both of structure and of insecticidal activity.[58]   The prosecution history does not
contain any transactions that would tend to contradict this interpretation.

It is recommended that the jury be instructed that "heterologous DNA encoding *Bacillus
thuringiensis* endotoxin" means any DNA that encodes for an endotoxin that a person of ordinary
skill in the art would recognize as a BT endotoxin, in terms of substantial similarity both of
structure and of insecticidal activity.

## Said DNA

All of the patent claims use the phrases "said DNA" or "said heterologous DNA" where
appropriate to refer to further plant characteristics or process steps.  Pioneer urges that this
phraseology be construed to require that any progeny plant must contain the identical DNA
sequence originally used in the bombardment process or found in the R0 transformant.  DeKalb
*argues that this restrictive interpretation would not allow for any structural or sequential changes*
caused by the DNA insertion process or by natural processes occurring within the cell.

Again, Pioneer's interpretation appears to be at odds with the patent specifications.  The
'520 patent discloses the possibility of changes in structure or sequence following bombardment
and chromosomal integration, noting that "intact sequences will not always be present,
presumably due to rearrangement or deletion of sequences in the cell." (C12L50-52)  The '956
patent similarly explains that the foreign gene is not present in the callus as the intact or
nonchromosomal plasmid used to bombard the callus (C20L12-14) and that Southern blot
technology indicated either incomplete digestion or that multiple rearranged copies were present
(C25L48-49).

---

[58] It is clear that identity of structure and function is not required with respect to the endotoxin.  The fact that the
specification teaches that modified genes and portions of genes may be used allows for the possibility of differences
in the encoded protein.

Case 1:05-cv-00355-SLR    Document 88-12    Filed 06/03/2005    Page 8 of 42

Report and Recommend... of Special Master Regarding Claim Const...tion          Page 50
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

Pioneer argues (Opening Brief, p. 54) that the patents "do not enable or provide a written description for a method in which the heterologous DNA in a transgenic progeny plant is modified or changed during the breeding process." If this is so, then Pioneer may have identified a <u>Gentry</u> issue,[59] or some other issue, that could provide a defense under 35 U.S.C. §112¶1. But that argument does not compel Pioneer's suggested claim construction. The patents make it clear that an important goal is to incorporate the beneficial transgene into a breeding program, and if the gene is altered by natural processes during that program, that result is certainly contemplated by the patents. The key requirement is that a person of ordinary skill in the art be able to recognize the genetic material for what it originally was. If so much alteration or modification has occurred that this is no longer possible, then there will, at that stage, no longer be literal infringement. It is recommended that the jury be instructed that "said DNA" refers to the DNA that was inserted into the transformed cells, even if altered by the insertion process or by later natural processes, so long as a person of ordinary skill can recognize it as the inserted DNA.

## Chromosomal Integration

The claims of the Adams '520 patent require that the transgene be "chromosomally integrated." Pioneer contends that this limitation should be read into the Lundquist patents as well. (Opening Brief, pp. 72-82) As best the SM can understand this argument, it addresses a pure <u>Gentry</u> issue[60] rather than one of claim construction. If Pioneer can establish that the Lundquist patents teach chromosomal integration as an essential element of the invention there disclosed, it may have identified a problem concerning the adequacy of the written description for claims that are not so limited. But it still will not have justified an interpretation of the claims that would supply that missing element.

---

[59] See notes 18-27, supra, and accompanying text.
[60] Id.

Respectfully submitted,

Robert L. Harmon

Special Master

## APPENDIX

### Claims of U.S. Patent 5,484,956 (issued to Lundquist *et al.*)

1. A fertile transgenic *Zea mays* plant of the R0 generation containing heterologous DNA encoding *Bacillus thuringiensis* endotoxin, wherein said DNA is expressed so that the plant exhibits resistance to an insect, wherein said expression is not present in said plant not containing said DNA, and wherein said DNA is transmitted through a complete normal sexual cycle of the R0 plant to the R1 generation, and wherein said DNA is introduced into said plant by microprojectile bombardment of *Zea mays* callus cells.

2. The transgenic plant of claim 1 wherein said DNA comprises a promoter.

3. The transgenic plant of claim 1 which is selected from the group consisting of field corn, popcorn, sweet corn, flint corn and dent corn.

4. A seed produced by the transgenic plant of claim 1 which comprises a replication of said heterologous DNA.

5. An R1 transgenic *Zea mays* plant derived from the plant of claim 1 wherein said R1 plant expresses said heterologous DNA so that the R1 plant exhibits said phenotypic characteristics.

6. A progeny transgenic *Zea mays* plant derived from the plant of claim 5 wherein said progeny plant expresses said heterologous DNA so that the progeny plant exhibits said phenotypic characteristics.

## Claims of U.S. Patent 5,538,877 (issued to Lundquist et al.)

1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) establishing a regenerable embryogenic callus culture from a *Zea mays* plant to be transformed, (ii) transforming said culture by bombarding it with DNA-coated microprojectiles, (iii) identifying or selecting a transformed cell line, and (iv) regenerating a fertile transgenic *Zea mays* plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny and imparts herbicide resistance thereto.

2. The process of claim 1 wherein the callus culture subjected to bombardment is in clumps of about 30 to 80 mg per clump.

3. The process of claim 1 wherein said callus is initiated on solid media.

4. The process of claim 1 wherein the DNA comprises a selectable marker gene or a reporter gene.

5. The process of claim 4 wherein said selectable marker gene imparts herbicide resistance to said fertile transgenic *Zea mays* plant.

6. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) establishing a regenerable embryonic callus culture from a *Zea mays* plant to be transformed, (ii) transforming said culture by bombarding it with DNA-coated microprojectiles, (iii) identifying or selecting a transformed cell line, and (iv) regenerating a fertile transgenic *Zea mays* plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, and imparts insect resistance thereto.

7. The process of claim 6 wherein the callus culture subjected to bombardment is in clumps of about 30 to 80 mg per clump.

8. The process of claim 7 wherein said callus is initiated on solid media.

9. The process of claim 6 wherein the DNA comprises a selectable marker gene or a reporter gene.

10. The process of claim 9 wherein said selectable marker gene imparts herbicide resistance to fertile transgenic *Zea mays* plant.

Report and Recommend.    .n of Special Master Regarding Claim Cons.    .tion          Page 54
Transgenic Corn Patent Litigation (N.D. Illinois – Judge Reinhard)

## Claims of U.S. Patent 5,538,880 (issued to Lundquist *et al.*)

1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells, and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, and imparts herbicide resistance thereto.

2. The process of claim 1 wherein the fertile transgenic *Zea mays* plant is regenerated from transformed embryogenic tissue.

3. The process of claim 1 wherein the cells are derived from immature embryos.

4. A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 1 which comprise said DNA.

5. The process of claim 4 wherein said progeny are obtained by crossing said fertile transgenic plant with an inbred line.

6. The process of claim 4 comprising obtaining seed from said progeny and obtaining further progeny plants comprising said DNA from said seed.

7. The process of claim 5 wherein the progeny obtained are crossed back to the inbred line, to obtain further progeny which comprise said DNA.

8. The process of claim 6 wherein seeds are obtained from said further progeny plants and plants comprising said DNA are recovered from said seed.

9. The process of claim 7 wherein said further progeny are crossed back to the inbred line to obtain progeny which comprise said DNA.

10. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) bombarding intact regenerable *Zea mays* cells with DNA-coated microprojectiles, (ii) identifying or selecting a population of transformed cells, and (iii) regenerating a fertile transgenic plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, wherein the DNA imparts insect resistance thereto.

11. The process of claim 10 wherein the fertile transgenic *Zea mays* plant is regenerated from transformed embryogenic tissue.

12. The process of claim 10 wherein the cells are derived from immature embryos.

13. A process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim 10, which comprise said DNA.

14. The process of claim 13 wherein said progeny are obtained by crossing said fertile transgenic plant with an inbred line.

15. The process of claim 13 comprising obtaining seed from said progeny and obtaining further progeny plants comprising said DNA from said seed.

16. The process of claim 14 wherein said progeny obtained are crossed back to the inbred line, to obtain further progeny which comprise said DNA.

17. The process of claim 15 wherein seeds are obtained from said further progeny plants and plants comprising said DNA are recovered from said seed.

18. The process of claim 16 wherein said further progeny are crossed back to the inbred line to obtain progeny which comprise said DNA.

## Claims of U.S. Patent 5,489,520 (issued to Adams *et al.*)

1. A process for producing a fertile transgenic *Zea mays* plant comprising the steps of (i) establishing a regenerable culture from a *Zea mays* plant to be transformed, (ii) transforming said culture by bombarding it with DNA-coated microprojectiles, wherein said DNA comprises a selectable marker gene encoding for phosphinothricin acetyl transferase, (iii) identifying or selecting a transformed cell line and (iv) regenerating a fertile transgenic *Zea mays* plant therefrom, wherein said DNA is transmitted through a complete sexual cycle of said transgenic plant to its progeny, wherein said progeny comprises said selectable marker gene encoding phosphinothricin acetyl transferase, and wherein said gene is chromosomally integrated.

2. The method of claim 1, wherein the gene encoding phosphinothricin acetyl transferase is the bar gene of *Streptomyces hygroscopicus*.

3. The method of claim 1, wherein the gene encoding phosphinothricin acetyl transferase is the bar gene of *Streptomyces viridochromogenes*.

4. The method of claim 1, further comprising obtaining progeny of said fertile, transgenic *Zea mays* plant, wherein said progeny is a fertile, transgenic *Zea mays* plant that comprises the gene encoding for phosphinothricin acetyl transferase.

5. The method of claim 4, further comprising breeding said progeny with a non-transgenic maize plant, to prepare a fertile, transgenic *Zea mays* plant that comprises the gene encoding for phosphinothricin acetyl transferase.

6. The method of claim 4, further comprising breeding said progeny with a second transgenic maize plant to prepare a fertile, transgenic *Zea mays* plant that comprises the gene encoding for phosphinothricin acetyl transferase.

7. The method of any one of claims 1 through 6, further comprising preparing seed from one or more fertile, transgenic *Zea mays* plants that comprises the gene encoding for phosphinothricin acetyl transferase, wherein said seed contains the gene encoding for phosphinothricin acetyl transferase.

8. The method of claim 7, further comprising cultivating said seed to prepare a fertile, transgenic *Zea mays* plant that comprises the gene encoding for phosphinothricin acetyl transferase.

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 C 50112 | **DATE** | 9/17/1999 |
| **CASE TITLE** | DeKalb Genetics Corp. vs. Pioneer Hi-Bred Int'l Inc. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due _____.  Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐  Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10)  ■  [Other docket entry]    The court hereby adopts all of the findings in the special master's Report and Recommendation as the findings of the court.  Pioneer's request for an oral hearing on the issue of claim construction is denied.

(11)  ■  [For further detail see order on the reverse side of the original minute order.]

| | No notices required, advised in open court. | | | number of notices | |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | | |
| | SW | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

(Reserved for use by the Court)

## ORDER

Seven patent infringement suits, in which DeKalb Genetics Corporation is the plaintiff, were referred on January 4, 1999, to Special Master Robert L. Harmon, who was approved by all the parties, pursuant to Fed. R. Civ. P. 53. The order of reference specified that the special master would "report to this court and the parties his conclusions, and the reasons for them, regarding the meaning of any disputed term in any allegedly infringed claim of the following patents: U.S. Patent Nos. 5,484,956; 5,489,520; 5,538,877; and 5,538,880." Order of Reference, ¶ 3, DeKalb Genetics Corp. v. Pioneer Hi-Bred Int'l, Inc., 96 C 50112 (N.D. Ill. Jan. 4, 1999). The special master held an evidentiary hearing on May 25-28, 1999, in which six expert witnesses testified and extensive attorney argument was heard. The parties filed extensive briefs both before and after the hearing. The special master's lengthy and comprehensive Report and Recommendation regarding claim construction was received by the court on June 30, 1999. All parties have filed objections to various aspects of the Report and Recommendation, but it is not necessary for the court to specifically address each objection. Suffice it to say, all counsel for all parties are knowledgeable and have been very thorough in presenting their arguments to the court.

The court, not the jury, has the power and obligation to construe as a matter of law the meaning of language used in patent claims. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) aff., 517 U.S. 370 (1996). This court has reviewed *de novo* the thorough Report and Recommendation, the objections thereto filed by the parties, the transcripts of the evidentiary hearing and the patents and their prosecution histories. The court hereby adopts all of the findings in the special master's Report and Recommendation as the findings of the court. See Fed. R. Civ. P. 52.

Mycogen and Pioneer's requests for oral hearings on the issue of claim construction are denied as neither seek to submit additional evidence, but rather to argue legal positions already clear to the court.

TAB

3

```
                                                    1
 1

 2              IN THE UNITED STATES DISTRICT COURT

 3                 NORTHERN DISTRICT OF ILLINOIS

 4                       WESTERN DIVISION

 5   ------------------------------------x
     DEKALB GENETICS CORPORATION,
 6
             Plaintiff,
 7                                    CA NO. 96C-50114
             -vs-                     CA NO. 96C-56241
 8
     CIBA-GEIGY CORPORATION, and MYCOGEN
 9   CORPORATION, including its operating
     subsidiaries Agrigenetics, Inc.
10   (d/b/a Mycogen Seeds) and
     MYCOGEN PLANT SCIENCE, INC.
11
             Defendants.
12   ------------------------------------x
     (caption continued on page 2)
13

14
                     IBM Plaza, 34th Floor
15                   Chicago, Illinois

16                   May 25, 1999
                     9:00 a.m.
17

18                   MARKMAN HEARING
                     Before Special Master
19                   ROBERT L. HARMON
                     Volume I
20

21
     Reported by:  Kristin Hoekstra, CSR
22   License No.:  084-003619

23

24

25
```

```
                                                   2
 1
 2      ---------------------------------------x
        DEKALB GENETICS CORPORATION,
 3
                     Plaintiff,
 4
                                 CA NO. 96C-50169
 5                   vs.         CA NO. 96C-50289

 6      NORTHRUP KING,

 7                   Defendant.
        ---------------------------------------x
 8      DEKALB GENETICS CORPORATION,
                     Plaintiff,
 9
                                 CA NO. 96C-50112
10                   vs.         CA NO. 96C-50239
                                 CA NO. 96C-50240
11
        PIONEER HI-BRED INTERNATIONAL,
12
                     Defendant.
13      ---------------------------------------x

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                                      1
1

2              IN THE UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF ILLINOIS

4                       WESTERN DIVISION

5    -------------------------------x
     DEKALB GENETICS CORPORATION,
6
               Plaintiff,
7                                   CA NO. 96C-50114
               -vs-                 CA NO. 96C-56241
8
     CIBA-GEIGY CORPORATION, and MYCOGEN
9    CORPORATION, including its operating
     subsidiaries Agrigenetics, Inc.
10   (d/b/a Mycogen Seeds) and
     MYCOGEN PLANT SCIENCE, INC.
11
               Defendants.
12   ---------------------------------x
     (caption continued on page 2)
13

14
                    IBM Plaza, 34th Floor
15                  Chicago, Illinois

16                  May 25, 1999
                    9:00 a.m.
17

18                  MARKMAN HEARING
                    Before Special Master
19                  ROBERT L. HARMON
                    Volume I
20

21
     Reported by:  Kristin Hoekstra, CSR
22   License No.:   084-003619

23

24

25
```

```
                                              2
 1
 2     -------------------------------------------x
       DEKALB GENETICS CORPORATION,
 3
                    Plaintiff,
 4
                               CA NO. 96C-50169
 5          vs.                CA NO. 96C-50289
 6     NORTHRUP KING,
 7               Defendant.
       -------------------------------------------x
 8     DEKALB GENETICS CORPORATION,
                    Plaintiff,
 9
                               CA NO. 96C-50112
10          vs.                CA NO. 96C-50239
                               CA NO. 96C-50240
11
       PIONEER HI-BRED INTERNATIONAL,
12
                 Defendant.
13     -------------------------------------------x
14
15
16
17                          .
18
19
20
21
22
23
24
25
```

```
                                                      3
 1

 2        APPEARANCES:

 3    ARNOLD, WHITE & DURKEE

 4              Counsel for the Plaintiff
                750 Bering Drive - Suite 400
 5              Houston, Texas  77057-2198

 6    BY:    RODERICK WILLIAMS, ESQUIRE
                THOMAS A. MILLER, ESQUIRE
 7              CHARLES DE LA GARZA, ESQUIRE
                DAVID L. PARKER, ESQUIRE

 8

 9    DORSEY & WHITNEY, L.L.P.

10              Counsel for the Defendant
                Northrup King
11              Pillsbury Center South
                220 South Sixth Street
12              Minneapolis, Minnesota  55402

13    BY:    RONALD BROWN, ESQUIRE
                KENNETH E. LEVITT, ESQUIRE
14              CRAIG D. DIVINEY, ESQUIRE

15

      WHITE & CASE, L.L.P.
16
                Counsel for the Defendant Ciba-Geigy
17              1155 Avenue of the Americas
                New York, New York  10036-2787
18
      BY:    DIMITRIOS DRIVAS, ESQUIRE
19              WILLIAM DISALVATORE, ESQUIRE
                DAVID C. VAN DYKE, ESQUIRE
20              CHASE J. ROMICK, ESQUIRE

21

      LYON & LYON, L.L.P.
22
                Counsel for the Defendant Mycogen
23              3200 Park Center Drive - Suite 1200
                Costa Mesa, California  92626

24
      BY:    ALLAN W. JANSEN, ESQUIRE
25              VICKI NORTON, ESQUIRE
```

```
                                                    4
 1

 2        APPEARANCES (cont'd):

 3   ORRICK, HERRINGTON & SUTCLIFFE, LLP

 4             Counsel for Mycogen
               666 Fifth Avenue
 5             New York, New York  10103-0001

 6   BY:       DANIEL J. THOMASCH, ESQUIRE
               LAUREN J. ELLIOT, ESQUIRE
 7             ROBERT M. ISACKSON, ESQUIRE

 8
     FOLEY & LARDNER
 9
               Counsel for the Defendant Pioneer
10             Hi-Bred International
               One IBM Plaza - Suite 3300
11             Chicago, Illinois  60611-3608

12   BY:       SHARON R. BARNER, ESQUIRE
               ANNETTE M. McGARRY, ESQUIRE
13             JEANNE MARIE GILLS, ESQUIRE
               RICHARD C. PEET, Ph.D., ESQUIRE
14

15

16

17

18

19

20

21

22

23

24

25
```

TAB

4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| DEKALB GENETICS CORPORATION, | ) | Civil Action No. 96 C 50112 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Philip G. Reinhard |
| | ) | |
| PIONEER HI-BRED INTERNATIONAL, | ) | Magistrate P. Michael Mahoney |
| INC., | ) | |
| | ) | Special Master Robert L. Harmon |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION OF SPECIAL MASTER
REGARDING PIONEER'S MOTION FOR SUMMARY JUDGMENT
THAT U.S. PATENT NO. 5,484,956 IS NOT INFRINGED**

This civil action involves an assertion of infringement of United States Patent No.

5,484,956. The '956 patent is owned by plaintiff DeKalb Genetics Corporation (DeKalb), and

defendant Pioneer Hi-Bred International is the accused infringer. The patent is in the field of

genetic engineering and relates to transgenic corn.

In an Order of Reference dated January 4, 1999, the Court appointed the undersigned as

Special Master (SM) in this and several related cases pursuant to Rule 53, FRCP. The specific

purpose of the reference was to have the SM provide a recommended construction of the claims

of the patents asserted in those cases, including the '956 patent. The "Report and

Recommendation of Special Master Regarding Claim Construction" (SM Report) was adopted

by the Court in its entirety by Order of September 17, 1999. Familiarity with the SM Report is

assumed in the discussion that follows.

Case 1:05-cv-00355-SLR    Document 88-12    Filed 06/03/2005    Page 26 of 42

Report and Recommendation of Special Master Regarding Pioneer's Noninfringement    Page 2
Summary Judgment Motion (Civil Action No. 96 C 50112 – N.D. Illinois – Judge Reinhard)

In its Second Order of Reference to Special Master entered July 24, 2000, the Court directed the SM to report "his conclusions, and the reasons for them, regarding the issues raised" in certain pretrial motions in this case, and a related case, <u>DeKalb Genetics Corp. v. Ciba-Geigy Corporation and Mycogen Corporation,</u> Civil Action No. 96 C 50241 (N.D. Ill.). Those motions include Pioneer's Motion For Summary Judgment That U.S. Patent No. 5,484,956 Is Not Infringed, which is the subject of this report. After full briefing, the parties presented oral argument at a hearing in Chicago, Illinois on November 3, 2000. For the reasons discussed below, it is recommended that Pioneer's motion be denied.

## DISCUSSION

### Summary Judgment Fundamentals

Summary judgment is as appropriate in a patent case as it is in any other case. A motion for summary judgment is properly granted only where the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The party moving for summary judgment carries the burden of demonstrating the absence of any genuine issue of material fact and its entitlement to judgment as a matter of law. In ruling on a motion for summary judgment, the district court is required to view the evidence presented in a light most favorable to the nonmoving party and to draw all reasonable inferences in favor of the nonmoving party. However, the nonmoving party must do more than simply present some evidence as to an issue it asserts is in dispute. Rather, the standard is that sufficient evidence must be forthcoming such as would allow a reasonable jury to return a verdict in favor of the nonmoving party.[1]

---

[1] E.g., <u>C.R. Bard Inc. v. Advanced Card. Sys. Inc.,</u> 911 F.2d 670, 15 USPQ2d 1540, 1542 (Fed. Cir. 1990).

The inquiry involved in a ruling on a motion for summary judgment necessarily

implicates the substantive evidentiary standard of proof that would apply at the trial on the

merits.[2] Infringement, literal or by equivalents, requires proof by a preponderance of the

evidence.[3] Though literal infringement of a properly interpreted claim is a fact question, its

determination may be rendered clearly erroneous through an improper interpretation and

application of the governing law.[4]

## Factual Background

### The Claims of the Patent

The claims of the '956 patent are reproduced in the Appendix to this report. DeKalb

asserts infringement of claim 6. (ASUF ¶7)[5] Claim 6 calls for a plant derived from the plant of

claim 5 (a plant of the R1 generation), which in turn is derived from the plant of claim 1 (a plant

of the R0 generation). Thus, claim 6 requires a fertile transgenic corn plant that contains

heterologous DNA encoding BT endotoxin, and that expresses such DNA to exhibit resistance to

an insect. Moreover, claim 6 requires that plant to have been derived, ultimately, from an R1

plant that was in turn derived from a fertile transgenic R0 plant regenerated from corn callus

cells into which the heterologous DNA was introduced by microprojectile bombardment.

### The Accused Pioneer Product Line

On July 1, 1993, Pioneer and Monsanto Company (now DeKalb's parent company;

ASUF ¶15) entered into a development agreement in which the parties agreed to collaborate to

genetically engineer an elite BT corn line. Pursuant to that agreement, Monsanto developed an

---

[2] E.g., Baker Oil Tools, Inc. v. Geo Vann, Inc., 828 F.2d 1588, 4 USPQ2d 1210, 1215 (Fed. Cir. 1987).
[3] E.g., Lemelson v. United States, 752 F.2d 1538, 224 USPQ 526, 531 (Fed. Cir. 1985).
[4] Amstar Corp. v. Envirotech Corp., 730 F.2d 1476, 221 USPQ 649, 653 (Fed. Cir. 1984).
[5] These citations are to Pioneer's Assembled Statement of Uncontested Facts (ASUF), which incorporates the assertions of both parties.

elite BT transgenic corn line referred to as MON810. (ASUF ¶16) Pioneer's commercial

YieldGard® products were developed in part by Monsanto. Those products are descendants of

the original plant developed by Monsanto, in that they include the MON810 event in their

lineage. (ASUF ¶18) The original R0 transformed plant, which was transformed with a codon-

optimized BT gene by microprojectile bombardment, was made by Monsanto prior to 1993 –

over three years before the '956 patent issued. R1 and subsequent generation plants were

likewise made by Monsanto prior to the issuance of the '956 patent. (ASUF ¶19) Monsanto

transferred MON810 progeny to Pioneer and Pioneer used the MON810 progeny to develop its

commercial YieldGard® product line. (ASUF ¶41) It is Pioneer's continued manufacture and

sale of YieldGard® products that is accused to be an infringement in this case. (ASUF ¶18, 30)

### The Monsanto/Pioneer Agreement[6]

Pursuant to the agreement between them, Pioneer is licensed "to use MONSANTO

Technology to develop Transgenic Corn Germplasm and to produce, have produced, use and sell

Licensed Corn Seed(s)." (¶5.2(a)(ii)) "Transgenic Corn Germplasm" is defined to mean

"germplasm or other plant material of a corn line, inbred or hybrid which contain a Gene or

Vector or is produced using MONSANTO Technology." (¶1.16) A "Gene" means "DNA

encoding an insect control protein from *Bacillus thuringiensis* and derivatives and modifications

thereof, which protein, upon expression in corn plants, results in protection against European

corn borer." (¶1.8) "Licensed Corn Seed(s)" are seeds "or other propagable plant material of

Transgenic Corn Germplasm." (¶1.11)

The agreement also provides that title to any "Gene" or "Transgenic Corn Germplasm"

and "all data, information and technology relating thereto furnished by either party in carrying

---

[6] The Development/License Agreement dated July 1, 1993, between Monsanto and Pioneer is submitted with
DeKalb's Supplemental Memorandum on the Implied Licensing Issue as Exhibit A.

out this Agreement shall remain in the party furnishing them." (¶6.1)  Upon termination of the

agreement, Pioneer must destroy all germplasm which has "been derived in whole or part

through the use of MONSANTO Technology." (¶6.6)

Thus, Pioneer has the right, during the term of the agreement, to use Monsanto's

technology, including its BT genes, to develop transgenic BT corn plants and sell seed from

them. Despite the successful commercialization of the YieldGard® product line, and despite

Pioneer having paid some $38 million to Monsanto, all has not been peace and harmony under

the agreement. In January of 1996 Monsanto acquired a minority equity ownership interest in

DeKalb (ASUF ¶28) and became licensed under DeKalb's newly-issued '956 patent (ASUF

¶29). In April of 1996, DeKalb commenced the present infringement suit against Pioneer on the

'956 patent. (ASUF ¶30) In March of 1997, Pioneer commenced its own action against

Monsanto in the Western District of Wisconsin, claiming among other things that Monsanto was

obliged under the agreement to obtain for Pioneer freedom to operate under the '996 patent.

(DeKalb Reply Exhibit E)

Pioneer's Wisconsin suit against Monsanto was transferred to the Eastern District of

Missouri.  On March 31, 1998, the Missouri court entered a "Memorandum and Order" denying

Pioneer's motion for summary judgment, concluding that the agreement "does not require

Monsanto to 'provide' freedom to operate, as Pioneer claims." (Miller Exhibit 2, p. 13) In

December of 1998, Monsanto acquired the remaining outstanding stock of DeKalb. (ASUF ¶31)

On the basis of this substantial change in the relationship between Monsanto and DeKalb,

Pioneer requested the Missouri court to reconsider its March order. The Missouri court ruled

from the bench on May 4, 1999, stating only that "the ruling on the motion for reconsideration is

that at this time the motion will be denied." (Miller Exhibit 7, p. 43)  On August 24, 2000, a jury

in the Missouri case returned a verdict finding that Pioneer had breached the agreement. (Miller

Exhibit 8) The parties informed the SM at oral argument that no appealable judgment has yet

been entered in the Missouri case, and that the court has not enjoined Pioneer from any activity,

including further use of the Monsanto technology and further commercialization of its

YieldGard® product line.

### Issue 1 – Does the Fact That Certain Activities Took Place Prior to the Patent Issue Date Preclude Liability for Subsequent Activities?

The second patent case ever decided by the Supreme Court, Evans v. Jordan, 13 U.S. 199

(1815), established the principle that use, subsequent to the patent issue date, of a device

constructed prior to issue, is an infringement. One of the predecessor courts[7] of the Federal

Circuit has unreservedly embraced this principle. See Coakwell v. United States, 372 F.2d 508,

153 USPQ 307, 309 (Ct. Cl. 1967) ("The fact that certain articles embodying an invention were

manufactured before and obtained by the defendant before the patent was issued does not

authorize their use thereafter.") Indeed, the Federal Circuit itself applied the principle in Johns

Hopkins Univ. v. Cellpro Inc., 152 F.3d 1342, 47 USPQ2d 1705 (Fed. Cir. 1998), which

involved a situation very similar to the present one.  The patent related to monoclonal antibodies,

which are produced by cloned cells known as hybridomas. Hybridomas grow and reproduce

rapidly and can be frozen for later use to produce additional monoclonal antibodies. 47 USPQ2d

at 1707.  The relevant portion of the patent claim was directed to a "monoclonal antibody which

specifically binds to an antigen on nonmalignant, immature human marrow cells, wherein said

antigen is stage specific and not lineage dependent, and said antigen is also specifically bound by

the antibody produced by" a particular hybridoma, the 12.8 hybridoma.  Id. at 1708.  Before the

---

[7] Decisions of the predecessor Court of Claims that are on point with the facts and legal issue of an appeal bind the Federal Circuit unless overruled by an in banc decision of the Federal Circuit. Gargoyles, Inc. v. United States, 113 F.3d 1572, 42 USPQ2d 1760, 1765 (Fed. Cir. 1997).

patent issued, the accused infringer, Cellpro, had produced a master cell bank constituting 100

vials of the hybridoma. Subsequent to the issue date of the patent, some of these vials were

thawed and cloned to create a working cell bank to produce the 12.8 antibody. Six of the vials,

however, were shipped to Canada and were never thawed or used in any way prior to their

export. Id. at 1712. The Federal Circuit concluded that there was no infringement with respect to

the six exported vials. The manufacture had taken place prior to the date the patent issued, and

use in or export to Canada, even after the patent issued, did not constitute infringement.

However, with respect to other vials from the master cell bank that were used in the United

States after the patent issued, the court found infringement. Id. at 1722-23. Thus, Cellpro stands

for the proposition that post-issue use of a biological material to produce more biological

material constitutes infringement, even where the original biological material was produced prior

to issue.

Cellpro, and the principle underlying Cellpro, dictate the result in this case. Although the

R0 plant specified in claim 1 and the R1 plant specified in claim 5 were produced prior to the

issue date of the '956 patent, it cannot be disputed that the accused "progeny plants" – the

YieldGard® product line – that were "derived from" those R0 and R1 plants as required by

asserted claim 6, were produced during the term of the patent. Pioneer argues that the law

requires that the plants of claims 1 and 5 also must have been produced during the term of the

patent, citing the patent law axiom that "dependent claims cannot be found infringed unless the

claims from which they depend have been found to have been infringed." Wahpeton Canvas

Co., Inc. v. Frontier, Inc., 870 F.2d 1546, 10 USPQ2d 1201, 1208 (Fed. Cir. 1989). However,

while this proposition is no doubt generally correct, it does not apply in all situations. Wilson

Sporting Goods Co. v. David Geoffrey & Assoc., 904 F.2d 677, 14 USPQ2d 1942, 1949 (Fed.

Cir. 1990). When one examines Wahpeton closely, it is clear that this rubric has to do with

whether all of the elements of the parent claims are present in the accused product, and not with

considerations such as when those elements were produced.[8]

The Wilson Sporting Goods decision makes this distinction clear. The court found that

the independent claim could not be given a range of equivalents broad enough to encompass the

accused device without also covering the prior art. The independent claim was therefore not

infringed. Nonetheless, despite noninfringement of the independent claim, the court found it

necessary to consider whether the dependent claims might be infringed.  It explained this

approach as follows, 14 USPQ2d at 1949:

> Before separately analyzing the asserted dependent claims, we should first explain
> why we are bothering to do so. This court has stated: "It is axiomatic that dependent
> claims cannot be found infringed unless the claims from which they depend have been
> found to have been infringed." *Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d
> 1546, 1553 & n.9, 10 USPQ2d 1201 , 1208 & n.9 (Fed. Cir. 1989).  While this
> proposition is no doubt generally correct, it does not apply in the circumstances of this
> case.
> Here, we have reversed the judgment of infringement of independent claim 1
> solely because the asserted range of equivalents of the claim limitations would
> encompass the prior art Uniroyal ball.  The dependent claims, of course, are *narrower*
> than claim 1; therefore, it does not automatically follow that the ranges of equivalents of
> these narrower claims would encompass the prior art, because of their added limitations.
> In contrast, in *Wahpeton Canvas* the court affirmed the judgment of noninfringement of
> the independent claims because the accused products did not include particular claim
> limitations or their substantial equivalents. 870 F.2d at 1552, 10 USPQ2d at 1207.  Where
> that is the reason for noninfringement of the independent claim, it follows that, for the
> same reason, the dependent claims will not be infringed.  But that is not true here and we
> therefore turn to the asserted dependent claims, to determine whether they can be
> infringed under the doctrine of equivalents.

Similarly, Pioneer's argument, for purposes of the present motion, is not based upon the

assertion that the R0 and R1 plants did not include the particular limitations of claims 1 and 6.

Rather, it is based upon the fact that those R0 and R1 plants were in existence before the patent

---

[8] As the Wahpeton court said, 10 USPQ2d at 1207n.9, "one who does not infringe an independent claim cannot
infringe a claim dependent on (and thus containing all the limitations of) that claim."

issued. But this is no different from a very common situation, wherein some or all of the components of a patented invention are in existence prior to the day the patent issued, and are combined later, after the patent issues, to produce the invention. Thus, the Wahpeton axiom no more controls this case than it did Wilson Sporting Goods.

The decision of Judge Jones in the San Diego case[9] involving Mycogen and Monsanto does not compel a different result. There the court decided that, under 35 U.S.C. §271(g), the patented process must have been performed during the patent term in order for there to be liability for use or sale of a product produced by that process. Assuming the correctness of this decision, it is readily distinguishable from the present case. Here the claims are directed to a product rather than a process. The use of a process involves carrying out the steps of the process. It would not therefore be unreasonable to require that at least one step of a patented process be carried out during the term of the patent in order to find infringement. But in the case of a product, use simply requires employing the product for some purpose during the term of the patent. The fact that some or all of the elements of the claimed product were in existence before the patent issued should not result in avoidance of liability. Here the R0, R1, and progeny plants satisfying all of the limitations of claims 1, 5, and 6 were in existence prior to the day the '956 patent issued. But Pioneer used those progeny plants to produce more progeny after the patent issued.[10] And this, assuming that the R0, R1, and progeny plants otherwise responded, as a matter of fact, to the limitations of claims 1, 5, and 6, was infringement.

---

[9] The order and opinion of Judge Jones in Case No. 95-0653-J, entered August 15, 1996, is discussed in the Report and Recommendation of Special Master Regarding Motions for Summary Judgment as to Mycogen's Liability Under 35 U.S.C. §271(g), pp. 6-8.

[10] Pioneer points to the fact that in his recommended construction of the product claims, the SM construed the "microprojectile bombardment" language as a process limitation. (SM Report at p. 19) However, the SM also concluded that the claims containing that language were not product-by-process claims. (Id. at 24) They are product claims, plain and simple.

### Issue 2 – Is DeKalb Estopped to Assert Infringement or, Alternatively, Does Pioneer Have An Implied License With Respect To The Accused Products?

Resolution of this issue requires two separate inquiries. The first is whether, assuming that Monsanto owned the '956 patent, it would be entitled, given the circumstances of the July 1, 1993 Monsanto/Pioneer agreement, to maintain this action for infringement against Pioneer. If that inquiry yields a negative answer, the second question would be whether the relationship between Monsanto and DeKalb is sufficient, by virtue of Monsanto's control of DeKalb and this litigation, to similarly preclude DeKalb from maintaining the action.

Pioneer argues that, because of the Monsanto/Pioneer agreement, Monsanto would be precluded from bringing or maintaining an infringement action against it under the '956 patent. It bases this argument upon principles of legal estoppel and the doctrine of implied license. The burden of proving that an implied license exists is on the party asserting implied license as a defense to infringement, but the existence of an implied license is a legal question.[11] The doctrines of legal estoppel and equitable estoppel have been applied by courts to imply a license. Legal estoppel is merely shorthand for saying that a grantor of a property right or interest cannot derogate from the granted right by its own subsequent acts. The rationale for that is to estop the grantor from taking back that for which it received consideration.[12] A formal finding of equitable estoppel is not required as a prerequisite to a legal conclusion of implied license. That would remove all distinction between the doctrines. The primary difference between the estoppel analysis in implied license cases and the analysis in equitable estoppel cases is that implied license looks for an affirmative grant of consent or permission to make, use or sell: i.e., a license. Equitable estoppel, on the other hand, focuses on misleading conduct suggesting that the

---

[11] Met-Coil Sys. Corp. v. Korners Unlimited, Inc., 803 F.2d 684, 231 USPQ 474, 476 (Fed. Cir. 1986).

[12] Spindelfabrik GmbH v. Schubert & Salzer, 829 F.2d 1075, 4 USPQ2d 1044, 1048 (Fed. Cir. 1987).

patentee will not enforce patent rights. Legal estoppel refers to a narrower category of conduct encompassing scenarios where a patentee has licensed or assigned a right, received consideration, and then sought to derogate from the right granted.[13]

The underlying rationale is that "when a seller sells a product without restriction, it in effect promises the purchaser that in exchange for the price paid, it will not interfere with the purchaser's full enjoyment of the product purchased. The buyer has an implied license under any patents of the seller that dominate the product or any uses of the product to which the parties might reasonably contemplate the product will be put." Hewlett-Packard Co. v. Repeat-O-Type Stencil, 123 F.3d 1445, 43 USPQ2d 1650, 1655 (Fed. Cir. 1997). Indeed, as the Supreme Court made clear in United States v. Univis Lens Co., 316 U.S. 241, 249, 53 USPQ 404 (1942), "[a]n incident to the purchase of any article, whether patented or unpatented, is the right to use and sell it."

Any disposition of an allegedly patented article, so long as it is within the license grant, exhausts all patent rights in that article. A conventional sale of an article is not required for exhaustion to apply, because the form of a disposition does not govern. Cyrix Corp. v. Intel Corp., 846 F.Supp. 522, 32 USPQ2d 1890, 1904 (E.D. Tex. 1994). Thus, there can be no doubt that had Monsanto owned the '956 patent at the time of the July 1, 1993 agreement, Pioneer would have an implied license under the patent even though the agreement contained no express grant of that right.[14] The fact that Monsanto later acquired the '956 patent would not change this result.[15]

---

[13] Wang Labs., Inc. v. Mitsubishi Elec. Am., Inc., 103 F.3d 1571, 41 USPQ2d 1263, 1271-72 (Fed. Cir. 1997).
[14] See, e.g., Ortho Pharm. Corp. v. Genetics Inst., Inc., 52 F.3d 1026, 34 USPQ2d 1444, 1449 (Fed. Cir. 1995); Cold Metal Process Co. v. Republic Steel Corp., 123 F.Supp. 525, 102 USPQ 14, 32-33 (N.D. Ohio 1954).
[15] See Minnesota Min. & Mfg. Co. v. E.I. DuPont deNemours & Co., 448 F.2d 54, 171 USPQ 11, 13-14 (7th Cir. 1971). Spindelfabrik GmbH v. Schubert & Salzer, 829 F.2d 1075, 4 USPQ2d 1044 (Fed. Cir. 1987), a case upon which DeKalb places much reliance, is to the same effect. 4 USPQ2d at 1048-49 & n.8.

Case 1:05-cv-00355-SLR    Document 88-12    Filed 06/03/2005    Page 36 of 42

Report and Recommendation of Special Master Regarding Pioneer's Noninfringement    Page 12
Summary Judgment Motion (Civil Action No. 96 C 50112 – N.D. Illinois – Judge Reinhard)

Perhaps the closest case on its facts to the present one is another decision of the Federal

Circuit's predecessor, the Court of Claims, in <u>AMP, Inc. v. United States</u>, 389 F.2d 449, 156

USPQ 647 (Ct. Cl. 1968). AMP entered into a contract with the government to develop and

supply a product invented by AMP. Under the contract, the government received a license to

practice the invention, whether or not it was patentable. The government also received a license

under any patents that AMP then owned or might later acquire during the contract term. Pursuant

to its rights under the contract, and during its term, the government acquired, from sources other

than AMP, some 26,000 tools incorporating the invention. Subsequent to completion of the

contract, AMP acquired a patent from a third party that also covered the tools. It sued the

government for infringement of that later-acquired patent in the Court of Claims. In holding that

the government had an implied license under the later-acquired patent, the court reasoned (156

USPQ at 651:

> The facet of this licensing agreement which is of crucial importance and which
> plaintiff ignores is that it licenses the Government to use an idea and not just the Byrem
> Patent itself. The Subject Invention may be practiced by or for the Government
> throughout the world "whether or not patentable." Art. 38(a)(i). Thus the license was to
> practice or cause to be practiced an idea regardless of its patentability. It is the idea
> embodied by the Byrem tool, which also happens to be patented, that was licensed to the
> Government. Relying on this license, the Government caused to be practiced this
> invention conceived of by plaintiff's employee, G. H. Byrem. The tools which allegedly
> infringe the patent in suit were identical in structure to the Byrem tool. The Government
> only did what it was licensed to do, no more and no less. Consequently, plaintiff is
> estopped from denying the Government the use of this tool. Plaintiff cannot negate the
> license it granted, and for which it received valuable consideration. Whatever rights third
> parties may have had against the Government are irrelevant to plaintiff's case since
> plaintiff licensed its rights to defendant, whereas other parties did not.

The parallels with the present case are striking. Monsanto licensed Pioneer under Monsanto

technology to produce BT corn seed. There was also an express license under any relevant

Monsanto patents. Monsanto could not derogate from this license by asserting an after-acquired

patent.

DeKalb offers to distinguish <u>AMP</u> on three grounds. (DeKalb supplemental brief at pp. 10-11) Its first two have to do with the fact that here, it is DeKalb rather than Monsanto that is suing for infringement. But as was made clear at the outset, this portion of the analysis proceeds on the assumption that Monsanto indeed owns the patent and is suing for infringement. The third ground emphasizes the fact that in <u>AMP,</u> the license was "to the tool itself, not just to certain patents that covered the tool." (<u>Id.</u> at p. 10)  DeKalb contrasts that with its characterization of the Monsanto/Pioneer agreement, which it says "provided a license only to a specific list of patents and applications, not a license to a 'product' and to all patents that might be later acquired that cover that product." This is simply not so.  As indicated above, in the discussion of the Monsanto/Pioneer agreement, it was in no way limited to "a specific list of patents and applications." Pioneer was given the broad right to use Monsanto technology, including genetic material supplied by Monsanto, to develop a commercial line of transgenic BT corn, and sell the corn seed. And in <u>AMP,</u> the fact that the government was expressly given a license under any later-acquired patents was immaterial, for that grant was explicitly limited to patents that were acquired <u>prior to completion of the contract</u>. The patent in suit there was acquired subsequent to the completion of the contract.  Had the express grant of a patent license been missing from the <u>AMP</u> contract, the result would not have been different, whether the patent in suit was acquired before or after completion of the contract.[16]

DeKalb argues that <u>Spindelfabrik GmbH v. Schubert & Salzer,</u> 829 F.2d 1075, 4 USPQ2d 1044 (Fed. Cir. 1987), dictates a different result. There the plaintiff had bought from a

---

[16] DeKalb's argument essentially parallels that of the concurring opinion in <u>AMP</u>.  156 USPQ at 652-53. But the other six members of the court did not rest their decision on the express patent license grant; instead, they found an implied license.  The Federal Circuit has approved the <u>AMP</u> reasoning. See <u>Wang Labs., Inc. v. Mitsubishi Elec. Am., Inc.,</u> 103 F.3d 1571, 41 USPQ2d 1263, 1271-72 (Fed. Cir. 1997).

third party some patents under which the defendant was licensed. The purchase was subject to

that license agreement. Previous to that purchase, the plaintiff had sued defendant for

infringement of a patent of its own. The licensed patents that plaintiff purchased from the third

party related to the product that was the subject of the infringement suit. The defendant asserted

a legal estoppel, contending that, through its purchase of the licensed patents, the plaintiff had

"stepped into the shoes" of the third party licensor. In rejecting this theory, the Federal Circuit

noted that the third party could not convey, under the license agreement, an absolute right to

make, use, and sell the product; it would necessarily be subject to the possible patent rights of

others. And the sale of the licensed patents to the plaintiff, even though it required plaintiff to

honor the license, did not purport to preclude the plaintiff from asserting its own patent against

the defendant. But the principal distinction here is that we are not dealing with a situation where,

through purchase of some patents, the plaintiff may be argued to have "stepped into the shoes" of

the former owner of those patents. Indeed, we have the converse situation. In this case the

licensor, Monsanto, has purchased the plaintiff, DeKalb, and now wishes to use DeKalb's '956

patent as justification for derogating from the rights it granted Pioneer under their 1993

agreement. Rather than supporting DeKalb's position, the Spindelfabrik case is consistent with

AMP.[17]

Nor does the Missouri litigation between Monsanto and Pioneer impact the present case

in any determinative way. There is no final judgment in that case, and the record in the present

case does not reflect what remedies may be forthcoming in Missouri. The Missouri court's

summary judgment decreed that Monsanto had no positive obligation to provide Pioneer with

---

[17] Note that the court assumed for purposes of its analysis that, if the third party licensor had acquired the plaintiff's patent, it would have been legally estopped under its license agreement with the defendant from asserting that patent against the defendant. 4 USPQ2d at 1048-49.

freedom to operate under DeKalb's patents, but it clearly did not conclude that Monsanto had the

right, should it acquire those patents, to interfere with Pioneer's freedom to operate under the

terms of the agreement. That issue was not litigated there, nor does it appear that it could have

been litigated there.  And while there may be a jury verdict that Pioneer has breached the

agreement, it does not appear that the Missouri court has yet decided on what, if any, the

appropriate remedies may be.  As far as the record in the present case reflects, the

Monsanto/Pioneer agreement is still in effect, and Pioneer still enjoys the rights it was granted

under the agreement. Those rights include, most notably, the right to use Monsanto's BT

technology to produce corn seed for sale. Monsanto cannot interfere with that right by asserting

that, in so doing, Pioneer is infringing the '956 patent.

Thus, if Monsanto owned the '956 patent, it would be precluded as a matter of law from

asserting that Pioneer's YieldGard® products infringe that patent.[18] But as already indicated, it is

DeKalb that is the record owner of the patent. Thus the question that remains to be decided is

whether Monsanto's relationship to DeKalb is sufficient to conclude that Monsanto could, if it

wished, compel DeKalb to withdraw its claim of infringement.

The record evidence on this question is scant but powerful. In January of 1996 Monsanto

purchased approximately 10% of DeKalb's Class A voting stock and 43% of DeKalb's

outstanding Class B non-voting stock. (ASUF ¶28) DeKalb brought this suit in April of 1996.

(ASUF ¶30) In December of 1998 Monsanto purchased the remaining outstanding stock of

---

[18] It is urged that, "even at the outermost margins of that issue, DEKALB would be entitled to maintain this action
for the infringement which occurred prior to Monsanto's acquiring DEKALB." (DeKalb brief at p. 3)  This does not
follow at all. If Monsanto has the right to control DeKalb and this litigation, it has the right to waive pre-acquisition
infringement damages. And if Monsanto has the obligation to refrain from interfering with Pioneer's enjoyment of
its rights under the Monsanto/Pioneer agreement, this includes the obligation to forego collecting damages that
Pioneer may have caused another party – in this case the pre-acquisition DeKalb – by exercising those rights. See
AMP, Inc. v. United States, 389 F.2d 449, 156 USPQ 647 (Ct. Cl. 1968).

DeKalb, and since that time DeKalb has been a wholly-owned subsidiary of Monsanto. (ASUF ¶ 31, 32) Thus Monsanto owns DeKalb.[19]

At oral argument, DeKalb's counsel declined to concede that Monsanto controls the present litigation.[20] In its response to Pioneer's statement of uncontested facts, it disputed the following assertions:

> 42. Monsanto controls DeKalb. It controls this litigation. Indeed, Monsanto's general counsel, R. William Ide, III, settled certain aspects of this litigation on behalf of DeKalb. The settlement agreement referred to DeKalb as one of the "Monsanto settlers."

The basis for DeKalb's dispute was that the Pioneer assertion did not comply with Local Rule 56.1(a) in that it did not include a specific reference to supporting materials. (ASUF ¶42)

Thus we are left with this situation: It is undisputed that Monsanto owns DeKalb. It is disputed that Monsanto controls this litigation, but that dispute appears to be based solely on the failure of Pioneer to support its assertions under L.R. 56.1(a), and not on any contrary evidence proffered by DeKalb. Pioneer argues that the only reasonable inference that can be drawn from the fact of Monsanto's ownership of DeKalb, its wholly-owned subsidiary, is that Monsanto controls DeKalb and, therefore, this litigation.

Unfortunately, the SM is not sufficiently versed in the intricacies of corporate law to know whether, as a matter of law, that is the only reasonable inference. And the parties have not briefed the matter sufficiently to enable an informed judgment on that question. Frankly, the SM has grave doubts that DeKalb could, if given the opportunity, establish that Monsanto does not

---

[19] DeKalb refused to admit that the two companies make joint filings to the SEC, or that Monsanto controls the membership of DeKalb's board of directors. It offered no contrary evidence, but rather disputed Pioneer's assertions on the ground that Pioneer had not satisfied the requirements of Local Rule 56.1(a). (ASUF ¶33)

[20] In its brief (p. 17), DeKalb says that more is required than just a showing of control. It says that Pioneer would also have to show a wrong by Monsanto through DeKalb, and unjust loss or injury to Pioneer. The SM is of the opinion that these elements are manifestly present here. The wrong is maintaining a suit for infringement of the '956 patent, through DeKalb, which Monsanto has no right to maintain. The injury is the harm that such a suit causes Pioneer.

have the power, by virtue of its ownership of DeKalb, to terminate this litigation. Nonetheless, if

there is the possibility that an inference of control does not automatically follow from a showing

of ownership, then DeKalb is entitled to the benefit of the contrary inference. In short, the record

as presented to the Court on this motion for summary judgment is simply not sufficiently

developed to permit a conclusion that, as a matter of undisputed fact or controlling law,

Monsanto could terminate the litigation. Accordingly, on that sole and very thin ground, it is

recommended that Pioneer's motion be denied.

This said, the SM feels bound to offer views on how this matter might best be resolved.

If the matter of control were to be decided in Pioneer's favor, it would be entitled to a judgment

of noninfringement. It would therefore be an inefficient use of the Court's time and resources to

conduct a plenary trial on all issues in the case if there were a possible way of disposing of the

control issue separately and expeditiously. Two approaches immediately suggest themselves.

One would be to hold a separate and earlier trial limited to the question of control. Such a trial

would not, under any reasonable circumstances, be expected to consume more than a few hours.

The other would be to permit Pioneer to renew its motion for summary judgment, limiting the

issue to control. Under this approach, both parties would advance whatever evidence they can

muster relative to that subject, and it could be readily determined whether a trial of the issue is

required. Under either approach, there is a very real possibility that an unnecessary trial on the

remaining issues in the case could be avoided.

Respectfully submitted,

Robert L. Harmon
Special Master

# APPENDIX

## Claims of U.S. Patent 5,484,956 (issued to Lundquist *et al.*)

1. A fertile transgenic *Zea mays* plant of the R0 generation containing heterologous DNA encoding *Bacillus thuringiensis* endotoxin, wherein said DNA is expressed so that the plant exhibits resistance to an insect, wherein said expression is not present in said plant not containing said DNA, and wherein said DNA is transmitted through a complete normal sexual cycle of the R0 plant to the R1 generation, and wherein said DNA is introduced into said plant by microprojectile bombardment of *Zea mays* callus cells.

2. The transgenic plant of claim 1 wherein said DNA comprises a promoter.

3. The transgenic plant of claim 1 which is selected from the group consisting of field corn, popcorn, sweet corn, flint corn and dent corn.

4. A seed produced by the transgenic plant of claim 1 which comprises a replication of said heterologous DNA.

5. An R1 transgenic *Zea mays* plant derived from the plant of claim 1 wherein said R1 plant expresses said heterologous DNA so that the R1 plant exhibits said phenotypic characteristics.

6. A progeny transgenic *Zea mays* plant derived from the plant of claim 5 wherein said progeny plant expresses said heterologous DNA so that the progeny plant exhibits said phenotypic characteristics.